HOUSING, INC.; MERHA, LTD.; CARL W. JOHNSON; AND JACKIE JOHNSON, PLAINTIFFS v. H. MICHAEL WEAVER; W. H. WEAVER CONSTRUCTION COMPANY; ALVIN R. BUTLER, TRUSTEE, DEFENDANTS, AND LANDIN, LTD., ADDITIONAL DEFENDANT.

No. 7718SC586

(Filed 1 August 1978)

1. **Duress § 1; Cancellation and Rescission of Instruments § 3.1— breach of fiduciary duty as duress**

     A contract induced by the breach of a fiduciary duty is a contract induced by duress.

2. **Duress § 1; Cancellation and Rescission of Instruments § 3.1 — trustee's breach of fiduciary duty — inducement of contract by duress**

     In an action to recover restitution based on defendants' alleged procurement of a contract by economic duress, the evidence on motion for summary judgment was sufficient to raise issues of fact as to whether the individual defendant held title to land as trustee for plaintiffs and whether plaintiffs were induced to enter the contract by the individual defendant's threat to breach his fiduciary duty by refusing to convey the land to plaintiffs and threatening to destroy a low income housing project in which the parties were jointly engaged.

3. **Duress § 1; Cancellation and Rescission of Instruments § 3.1— breach of contract — duress inducing subsequent contract**

     In an action to recover restitution based on defendants' alleged procurement of a 1972 contract by economic duress, the evidence on motion for summary judgment was sufficient to raise issues of fact as to whether (1) there was a breach or threat of breach by defendants of a 1971 agreement in which the parties agreed to engage jointly in a low income housing project, (2) the breach or threatened breach induced the 1972 agreement settling a dispute between the parties, and (3) the breach or threat of breach amounted to duress, where there was evidence tending to show that the individual defend-

Housing, Inc. v. Weaver

ant obtained title to certain land through the 1971 agreement; defendants were to perform the construction work on the project; defendants breached the 1971 agreement by failing to provide working capital, refusing to pay engineering costs and a loan commitment fee, and trying to drain off all the profits by raising the construction costs; defendants threatened to use their interest in the project to destroy it if plaintiffs did not pay them $270,000; the government was threatening to cancel the project if plaintiffs did not begin construction; plaintiffs were forced with the choice of entering the 1972 agreement with defendant or losing the entire project; and plaintiffs signed the 1972 agreement agreeing to pay defendants $212,500 plus expenses for defendants' interest in the project in order to obtain the land and avoid losing the project.

**4. Duress § 1— contract procured by duress—restitution**

The remedy in an action on a contract procured by duress is restitution.

**5. Duress § 1— contract procured by duress—no ratification by retention of property**

In an action to recover restitution based on defendants' alleged procurement of a contract by economic duress, summary judgment for defendants was not proper on the ground that plaintiffs ratified the contract by retaining property transferred to them as a result of the contract where plaintiffs contended that they were in fact the equitable owners of the property and the individual defendant held legal title for them, and that defendants forced them to pay for property which was rightfully theirs, since the restitutionary remedy would award plaintiffs both the property and the return of their funds paid to defendant to obtain the property.

**6. Duress § 1— contracts procured by duress—no ratification by payments or passage of time**

In an action for restitution based on defendants' alleged procurement of a contract by economic duress, summary judgment was not proper for defendants on the ground that plaintiffs had ratified the contract by making payments to defendants under the contract and waiting 20 months to file suit where plaintiffs presented evidence that the individual defendant had record title to land obtained for a low income housing project but that plaintiffs had the equitable interest in the land; plaintiffs were forced to enter the contract by the individual defendant's refusal to transfer title to them and his threat to destroy the housing project through his control of the land; and although the individual defendant transferred title to the land to plaintiffs pursuant to the agreement, the duress continued because defendants in the same transaction demanded and received a deed of trust on the land securing notes given by plaintiffs pursuant to the contract.

Judge MARTIN dissents.

APPEAL by plaintiffs from *Collier, Judge*. Judgment entered 11 May 1977 in Superior Court, GUILFORD County. Heard in the Court of Appeals 7 April 1978.

The plaintiffs filed suit 31 December 1973, alleging, *inter alia*, that an agreement dated 27 April 1972 (hereinafter referred to as the 27 April 1972 agreement)—one of two contracts underlying this suit—was procured by economic duress. They seek restitution plus consequential damages. They pray that a note for $122,500 given as part of the consideration for the 27 April 1972 agreement be declared null, void, and of no legal effect and that the deed of trust securing it be cancelled and that they recover of H. Michael Weaver and Weaver Construction Company the sum of $63,333 (the amount already paid to defendants in excess of defendants' actual expenses of $58,421). Plaintiffs further seek $500,000 in consequential damages due to a loss in cash flow. Plaintiffs either alternatively or in addition to the "inducement by economic duress" claim allege a breach of the initial 21 April 1971 agreement.

Defendants answered denying any wrongful acts in inducing the 27 April 1972 agreement and denying any breach of the 21 April 1971 agreement. Defendants counterclaimed seeking recovery of $122,500 on the note which was given as part of the consideration for the 27 April 1972 agreement and $76,667 (principal and interest) on the balance of the 27 April 1972 agreement. Defendants' further counterclaim for $150,000 damages for alleged abuse of process was dismissed, but that dismissal is not before this Court. Defendants also impleaded Landin, Inc., whom they allege to be the alter ego of plaintiffs.

Plaintiffs are a developer, his wife, and two corporations owned by him. Since there is an identity of interests, they will be hereafter referred to as plaintiff. Defendants are a developer, the corporation owned by him and his family, and the trustee of the deed of trust. Since the interests of these persons are identical, they will be referred to collectively as the defendant. The third-party defendant is a corporation owned by plaintiff Carl W. Johnson, and it is the present owner of the properties involved.

Prior to 21 April 1971 plaintiff had received a commitment from HUD to subsidize and guarantee the rental of low income housing projects in eastern North Carolina. The project, known as "Mid-East", involved construction in five counties on 11 different tracts of land. Plaintiff needed to associate with another developer to provide "bonding capacity" (the ability to acquire a

payment and performance bond) and capital for prefinancing expenses. After negotiations, plaintiff and defendant executed "a memoranda of understanding" 21 April 1971. The memorandum was in the form of a letter from defendant to plaintiff. It provided *inter alia* that:

(1) The parties intended to form a joint venture of some type.

(2) Defendant would provide capital until construction financing was obtained.

(3) Defendant would advance to plaintiff $50,000.

(4) Defendant would build the project and receive cost plus 4% prior to division of profits.

(5) "Profits" were defined to mean the difference in all development costs and the amount that could be borrowed on the completed project.

(6) "Profits" were to go 70% to plaintiff 30% to defendant.

(7) Losses were to be borne 50-50.

(8) Completed projects were to be owned 50-50 and, possibly, the properties could be divided with each party owning 100% of 1/2 of the total properties.

(9) Withdrawal prior to 15 May 1971 would leave each party to bear his own expenses except that plaintiff would reimburse defendant for land purchases.

(10) If there were a loss, plaintiff would repay the $50,000 advance to defendant.

In setting up the project, plaintiff had previously acquired options on certain lands (more than 20 tracts). The time approached for the expiration of these options. In June 1971, it became necessary to exercise certain of these options. Rather than have the property conveyed to plaintiff or to a Johnson-Weaver joint venture and then give a deed of trust for the purchase price to defendant (who was to furnish the money), the parties agreed that H. Michael Weaver (a named defendant) would take title in his individual name. Both parties agree that the reason was to simplify the transaction. Defendant also suggests the desire to avoid certain negative tax consequences.

During September and October of 1971 the relationship became less amicable. A dispute arose over construction costs. Plaintiff's evidence suggests the following:

(1) Defendant refused to co-operate on obtaining one financing package to provide a $4,250,000 loan (eventually a $3,920,000 loan was secured).

(2) Defendant would not pay the loan commitment fee on the loan eventually received.

(3) Defendant would not give a maximum on construction costs under the 21 April 1971 agreement except for a $3,920,000 maximum which would cut plaintiff out of all the "profits".

(4) Other companies offered to build the project for $3,300,000 or less.

(5) Defendant was attempting to drain all the profits off for itself by way of the construction process.

(6) Defendant became unreasonable and threatened to destroy the project through its record ownership of crucial lands.

(7) Defendants breached certain other duties.

(8) Defendant used its ownership of the lands to force plaintiff to enter another agreement.

Defendant vehemently disagrees and offers evidence tending to show the following:

(1) Plaintiff wanted all the profit once it became apparent that it would be profitable.

(2) Defendant did not breach any duties.

(3) Plaintiff has colored certain instances in which defendant acted reasonably to look like a breach.

(4) Defendant was not obligated to give a maximum price.

(5) $3,920,000 was a reasonable maximum since it really involved only $3,480,000 for construction.

(6) Plaintiff, as well as defendant, rejected the $4,250,000 loan offer for other reasons.

(7) Defendant was always entitled to 1/2 of the lands and did not hold the lands for anyone else's benefit.

(8) Defendant owned 1/2 of the whole project and sold it under the compulsion of plaintiff.

The parties continued negotiations. It became apparent to both parties that they could not work together. Plaintiff wanted to get the land back. Defendant demanded $225,000 plus expenses. Plaintiff offered $170,000 plus expenses. Some evidence indicates that defendant offered to buy plaintiff out for $225,000. By agreement of 27 April 1972, plaintiff bought out defendant for $212,500 plus expenses (total $270,921.94). Payment was made as follows:

(1) Reimbursement of expenses was due at the closing of the construction loan.

(2) $20,000 paid by assignment to the defendant of an obligation of the defendant held by plaintiff.

(3) $70,000 paid by a non-negotiable note, secured by a deed of trust on 1/2 the property, due upon closing of permanent financing.

(4) $122,500 paid by a non-negotiable note, secured by a deed of trust on the other 1/2 of the property, due upon closing of permanent financing.

(5) Interest began on the later of 1 June 1972 or the commencement of construction.

(6) If the permanent loan did not exceed the development costs, plaintiff was only obligated to pay at the rate of $3,000 per month.

Payments were made as follows:

(1) $20,000.00     July 14, 1972

(2) $18,421.94     September 12, 1972

(3) $70,000.00     October 3, 1972

(4) $13,333.00     October 3, 1972

    Total paid $121,954.94

Plaintiff's evidence suggests that the housing authority and HUD at all times from October 1971 until April 1972, were urging him to begin construction. Johnson testified that the housing authority and HUD threatened to withdraw their commitment and award the project to another developer. He further testified that the press of time and the danger of losing the project forced him into compliance. Further evidence suggests that the fear that defendant would foreclose on the two deeds of trust forced him to continue payments.

Plaintiff proceeded on his own after 27 April 1972. In June 1972, he sold 1/2 interest in the project for $250,000 to Merha, Limited, a limited partnership of which Housing, Inc., was the general partner. The savings and loan which furnished construction financing foreclosed during the fall of 1973. Landin, Ltd., a corporation wholly owned by Carl W. Johnson, purchased the project at the foreclosure sale. The process was completed in November or December of 1973. Landin still owns the property. After foreclosure, plaintiff ceased payments on the obligations to defendant and filed suit 31 December 1973 seeking a return of the monies paid and nullification of the notes not yet paid.

By written motion filed 21 March 1977, defendants moved for summary judgment as to both plaintiffs' claim and defendants' counterclaim. By order of 9 May 1977, the trial court granted summary judgment in favor of defendants. From that judgment, plaintiffs appeal.

*Smith, Moore, Smith, Schell & Hunter, by Jack W. Floyd, for plaintiff appellants.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by James T. Williams, Jr., and Edward C. Winslow III, for defendant appellees H. Michael Weaver and W. H. Weaver Construction Company.*

MORRIS, Judge.

Plaintiff appeals from the entry of summary judgment in favor of defendant as to both plaintiffs' claim and defendants' counterclaim. This case involves an exceedingly complicated series of business transactions between plaintiffs and defendants and a claim for relief in excess of one-half a million dollars. The

record reveals that well over 15 documents have been omitted. There are no transcripts from any hearings. However, the record contains 434 pages. Upon a motion for summary judgment, the trial court *first* must determine whether there is a genuine issue as to any material fact. Only *after* the trial court determines that there is no genuine issue as to any material fact, can it dispose of the matter. *Doggett v. Welborn*, 18 N.C. App. 105, 196 S.E. 2d 36, *cert. denied* 283 N.C. 665, 197 S.E. 2d 873 (1973).

> "Upon motion a summary judgment must be entered 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.' G.S. 1A-1, Rule 56(c). The party moving for summary judgment has the burden of establishing the lack of any triable issue of fact. His papers are carefully scrutinized and all inferences are resolved against him. [Citations omitted.] *The court should never resolve an issue of fact. . . .*" (Emphasis added.) *Kidd v. Early*, 289 N.C. 343, 352, 222 S.E. 2d 392, 399 (1976).

The record before this Court is so lengthy, the case so vigorously contested, the depositions so contradictory, and the issues so complex, that the case appears, even at first glance, to be an obviously inappropriate case for granting a motion for summary judgment.

> "Summary judgment is a drastic remedy. Its purpose is not to provide a quick and easy method for clearing the docket, but is to permit the disposition of cases in which there is no genuine controversy concerning any fact, material to issues raised by the pleadings, so that the litigation involves questions of law only. [Citations omitted.]" *Savings & Loan Assoc. v. Trust Co.*, 282 N.C. 44, 51, 191 S.E. 2d 683, 688 (1972).

Plaintiffs allege in the complaint that defendants induced the 1972 agreement by duress and that the agreement is, therefore, voidable. They seek restitution of monies paid pursuant to that agreement. Plaintiffs also are seeking damages resulting from defendants' alleged breach of the 1971 agreement. Defendants have denied liability, alleging that the 1972 agreement was a reasonable adjustment of the dispute arising out of the 1971 agreement. Defendants also, by way of a counterclaim, seek to

recover the amount due on notes given pursuant to the 1972 agreement. It is obvious that the issues as to both plaintiffs' claim and defendants' counterclaim are precisely the same. Also, since this case is before us to review the entry of summary judgment in favor of defendants, the defendants have the burden of establishing their right to summary judgment on both the claim and the counterclaim. Thus, since the issues and the burden of proof are the same, we shall discuss the claim and counterclaim as if there were only one claim.

Our review of the trial court's entry of summary judgment involves a two-part inquiry. First, does the record, taken in the light most favorable to the plaintiff, reveal sufficient evidence that the 1972 contract was induced by duress to raise a substantial issue of fact as to duress? Second, assuming that the 1972 contract was induced by duress, does the record, taken in the light most favorable to the plaintiff, reveal sufficient evidence that plaintiffs' payments and acquiescence did not amount to ratification of the 1972 agreement to raise a substantial issue of fact as to ratification?

I.

We will examine the "duress" issue first. This inquiry is two-fold: (1) Was the contract induced by the breach of a fiduciary duty? (2) If the defendant Michael Weaver did not hold title as trustee for plaintiffs or did not breach any fiduciary duties, did the threat of breach of the 1971 agreement amount to duress and induce the 1972 agreement?

Plaintiffs allege that they allowed defendants to exercise the options to purchase the real property in this case upon the understanding that defendant Michael Weaver, the record title holder, would reconvey the property to plaintiffs and that he, therefore, held the property as trustee for plaintiffs. Plaintiffs contend Weaver's breach or threat of breach of that fiduciary duty was the means by which plaintiffs were forced to enter into the 1972 agreement.

[2]   Is there evidence of a fiduciary relationship between Michael Weaver and plaintiffs?

"North Carolina has never adopted the Seventh Section of the English Statute of Frauds which requires all trusts in

land to be manifested in writing. [Citations omitted.] '[I]t is uniformly held to be the law in this State that where one person buys land under a parol agreement to do so and to hold it for another until he repays the purchase money, the purchaser becomes a trustee for the party for whom he purchased the land, and equity will enforce such an agreement.' [Citations omitted.] Moreover, a parol trust 'does not require a consideration to support it. If the declaration is made at or before the legal estate passes, it will be valid even if in favor of a mere volunteer.' [Citations omitted.]. . . ." *Ketner v. Rouzer*, 11 N.C. App. 483, 489, 182 S.E. 2d 21, 25 (1971). *See also Avery v. Stewart*, 136 N.C. 426, 48 S.E. 775 (1904).

Plaintiff Carl Johnson testified that plaintiffs

". . . permitted Mike Weaver, individually, to take title to lands that were under option to Housing, Incorporated and—my impression—to hold in trust for Housing, Incorporated until such time as we reached a joint venture agreement or some agreement under our understanding of April 21, '71—

\*    \*    \*

When I say 'held in trust,' we're talking about properties that were optioned by Housing, Incorporated on which we were to build units to be leased to the Mid East Regional Housing Authority. The reason the properties were titled to Weaver individually is because we had not at that time been able to agree to what vehicle or corporation, joint venture, partnership, or whatever, that we would use. . . . [I]t was discussed . . . that rather than to form a corporation or to put them in the name of Housing, Incorporated and to have to record the necessary deeds of trust and security for the Weaver interests, . . . that this step simply be simplified by putting the lots in Mike's name—and I speak of 'Mike' as H. M. Weaver; and this, of course, would simplify the legal work and recording of the security, and so forth."

He further testified that "we were to have a completed project before Weaver had any interest. . . ." Indeed, defendant Michael Weaver also acknowledged that he held the property in trust although the parties do not agree on what the terms were. We believe that this testimony, if found to be true, is sufficient

evidence of the existence of a fiduciary relationship for the purpose of reviewing a motion for summary judgment.

[1, 2]   A contract induced by the breach of a fiduciary duty is a contract induced by duress.

> " 'Duress exists where one, by the *unlawful* act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will.' [Citations omitted.] . . . [A]n essential element of duress is a *wrongful* act or threat. . . ." *Link v. Link*, 278 N.C. 181, 194, 179 S.E. 2d 697, 704 and 705 (1971).

It is abundantly clear that a breach (or threat of breach) of a fiduciary duty is a "wrongful" act within the meaning of that term in the law of duress. *See* Dobbs, Handbook on the Law of Remedies (1973), § 10.2 at 667. The sole remaining question is whether the breach or threat of breach of the fiduciary duty induced the 1972 agreement. Carl Johnson testified that he "signed under considerable duress, because at that time we had permitted Mike Weaver, individually, to take title to lands. . . ." He further stated that

> "after my agreeing to . . . H. Michael Weaver taking title to the land, and I believe that he took title . . . in June. It was after that time that I realized that we were no longer equal partners in a debate. He had the land and we no longer were . . . equals. . . ."

Johnson also testified that Michael Weaver's father threatened to destroy the project if Johnson didn't cooperate. This testimony, if believed, is clear and sufficient evidence that the threat of breach of the fiduciary duties was that which induced plaintiffs to enter into the 1972 agreement.[1]

---

1. We note that, insofar as the result in this case is concerned, it does not matter whether one analyzes plaintiffs' claim for relief as one grounded simply upon breach of fiduciary duty or as one grounded upon duress through breach of fiduciary duty. The remedy for duress is restitution. Similarly, one who breaches his fiduciary duty can be forced to disgorge his ill-gotten gains. *See Bank v. Waggoner*, 185 N.C. 297, 117 S.E. 6 (1923).

[3]  Alternatively,[2] the plaintiffs allege that the 1972 agreement was induced by the breach or threat of breach of the 1971 agreement[3] and that this breach or threat of breach amounted to duress. We confront three questions: (1) Is there substantial evidence of a breach or a threat of breach? (2) Is there substantial evidence that that breach or threat of breach induced the 1972 agreement? (3) Does that breach or threat of breach amount to duress?

Assuming that there was a binding contract, we believe that the record reveals substantial evidence of a breach of the 1971 agreement. The 1971 agreement committed Weaver to build the project. The agreement defined "profits" as the excess of the amount of the permanent loan over the costs. These profits were to be divided 70% to 30% in favor of plaintiffs. Johnson testified that Weaver tried to drain off all the profits by raising the construction costs. Johnson's testimony suggests that Weaver was trying to charge $600,000 in excess of the eventual costs. If one believes Johnson, this effort by Weaver was in violation of Weaver's duty under the agreement to work out problems incurred "to the mutual benefit of the parties" and also an anticipatory breach of his duty to build the project for "actual cost" plus 4%. Additionally, there is evidence that Weaver declined to pay a bill from an engineering company and a loan commitment fee. These refusals are evidence of Weaver's breach of his duty to contribute "working capital" prior to the closing of construction financing. We believe that this testimony, if believed, is sufficient to raise a genuine issue as to breach.

Next, there must be evidence that the breach was that which induced plaintiffs to enter into the 1972 agreement. See 13 S. Williston, A Treatise on the Law of Contracts, § 1617 (1970). It is obvious that if some factor other than the wrongful act of which plaintiffs complain motivated them to enter into the 1972 agree-

---

2. For the purposes of this discussion we will assume that there was no breach of a fiduciary duty. Michael Weaver testified that he held title not for Johnson but for the Weaver-Johnson joint venture. Since this position is not necessarily inconsistent with Johnson's testimony that Weaver was "to hold in trust for Housing, Incorporated until such time as we reached a joint venture agreement . . .", we will assume for the purposes of this discussion that Weaver held title in trust for a third-party Weaver-Johnson joint venture. Thus, Johnson's demand that Weaver transfer title to him would not have been a proper demand. Weaver, therefore, would not have been technically guilty of a breach of fiduciary duties, nor would there be evidence of a threat of breach.

3. Due to the nature of the record before us, it is not clear whether the 1971 "Agreement" was a binding contract. At some points both parties contend it was binding; at others, they deny that it was binding. For the purposes of this discussion we will assume that it was binding since there is some evidence to that effect.

ment, there was no duress. It is undisputed that Weaver came to hold title as a part of the 1971 agreement in partial fulfillment of his obligation to provide working capital. Johnson testified as follows:

> "The Johnson interests or, rather, the Housing, Incorporated and the Weaver interests had not been able to come to an agreement that was mutually satisfactory and acceptable in accordance with the agreement of April 21, 1971. After a period of time, it came to the point where it wasn't a negotiation under the intent and purpose of the April 21 agreement; it became a negotiation that was somewhat one-sided. And as far as Housing, Inc. was concerned, it was a matter of survival. . . .
>
> . . . I continued to try to work the thing out right on up to the point of finally signing an agreement that I felt that I signed under considerable duress, because at that time we had permitted Mike Weaver, individually, to take title to lands that were under option to Housing, Incorporated . . . ."

It is obvious from this testimony that there is substantial evidence that the breach of the 1971 agreement was the motivating factor behind the 1972 agreement. As one might well expect, Weaver testified that Johnson was motivated by his desire to realize all of the profits from the project. This recurring conflict in the evidence, however, makes this case inappropriate for summary judgment.

Finally, we determine whether the type of breach and threat of breach alleged in this case if found to exist would constitute "duress", as that term is defined, for the purposes of granting or denying restitution. Plaintiffs' evidence suggests that Michael Weaver got title to certain real estate through the 1971 agreement, that defendants breached the contract by failing to provide working capital, in refusing to pay engineering costs and a loan commitment fee, and by trying to drain off all the profits in failing to set a reasonable maximum cost, and that defendants threatened to use their interest in the project to destroy it if plaintiffs did not pay them $270,000. We do not have to determine whether the result would be the same if Michael Weaver had not acquired record title to the real estate. Both the complaint and

the testimony of Carl Johnson rely specifically upon the fact that Weaver held the record title to the property as the reason plaintiffs entered into the 1972 agreement.

In *Rose v. Materials Co.*, 282 N.C. 643, 194 S.E. 2d 521 (1973), the Supreme Court confronted the question of whether a threat of breach of a contract could amount to duress. In that case defendant had contracted to supply stone to plaintiff at a set cost. Defendant later refused to furnish the stone unless plaintiff agreed to a price increase. Plaintiff needed the stone for his concrete business, and defendant was the sole local supplier. Plaintiff acquiesced, and, when he could otherwise obtain stone, sued for the return of the excess he had paid. The Court held that plaintiff was entitled to restitution. The Court discussed its decision as follows:

> "What are the essential characteristics of economic duress? 'A threatened violation of a contractual duty ordinarily is not in itself coercive, but if failure to receive the promised performance will result in irreparable injury to business, the threat may involve duress.' 13 Williston, Contracts, § 1617 (3d ed. 1970). 'Perhaps the cases would support, for some jurisdictions at least, the generalization that a threat to breach a contract, if it does create severe economic pressure upon the other party, can constitute duress where the threat is effective because of economic power not derived from the contract itself.' Dobbs, Remedies, § 10.2 (1973).
>
> $*$    $*$    $*$
>
> Under these circumstances, we think that defendant's threatened, and actual, breach of contract was coercive, and that plaintiff yielded because of economic duress. The threat was effective as a result of defendant's economic power derived from his status as sole supplier of stone, not because of any economic power derived from the contract itself. Dobbs, supra, § 10.2. This economic power continued through the entire ten-year term of the contract, so that the economic duress was likewise continuous. . . ." 282 N.C. at 665 and 666, 194 S.E. 2d at 536 and 537.

In our present case, plaintiffs found themselves in a similar predicament. Defendants had acquired title to the land and were

now refusing to fulfill their obligations under the contract This alone did not constitute duress. Defendants, also, had threatened to destroy the whole project. Johnson testified:

> "Mike's father lost his temper one day, jumped up and down and pounded the table. . . . Mr. Weaver told me one day, in no uncertain terms, that if this project was ever built, that it would only be built by Weaver Construction Company and, if I didn't believe it, to press him."

Johnson also testified that the delays were creating problems.

> "[T]he loss of it [the project authorization] was imminent. I was getting threatening telephone calls from everybody. . . .
>
> Mr. Worth Chesson, executive director of the Authority, called and said, 'If you can't do something, you've got to get off the pot.' Mrs. Farrior, the chairman of the Authority, various people of HUD, were saying that they just can't wait; they've got to move the project."

Johnson testified that defendants were conscious of the power they had over the project.

> "The times that I began to feel that I was being coerced was when I was sat down into a conference room with Mr. Weaver and his counsel, Ted Leonard, and was negotiated with in manners that I felt were somewhat unfairly, in that they held the power; they had the land; it was necessary for the land to be—the land was a necessary ingredient in order to complete the project, and always the fact that the Weaver interests held the land and would never permit its return to Housing, Inc. without the additional payment of some—anywhere from two hundred to two hundred and twenty-five thousand dollars as a bonus for the return; it was then that I felt I was being unfairly dealt with. . . ."

It is the confluence of these two factors with the breach that created the duress. If plaintiffs had controlled the land, they could have proceeded without defendants and sued them. If the government had not been threatening to cancel the project unless they started construction, plaintiffs could have litigated prior to construction. These alternatives, however, were foreclosed. Thus, plaintiffs, according to their evidence, faced two choices: (1) Enter

into the 1972 agreement or (2) Lose the entire project. In similar situations, leading commentators have found duress. *See* Dobbs, § 10.2 at 668; Williston, § 1617; *see also* Restatement of Contracts, § 493, Comment e, Illustrations 8 and 13 (1932); Restatement (Second) of Contracts § 317, Comment b, Illustrations 3, 4 and 5 and § 318(1)(d), Comment e, Illustration 10 (Tent. Draft No. 12, 1977). This situation is clearly within the purview of the rule set out in *Rose v. Materials Co., supra.* The Court there held that breach of contract would amount to duress if the breach threatened to destroy the victim's business where the wrongdoer's power did not come to him as a result of the contract. Here defendants' power to destroy the project was a result of the government's threats to cancel the project if plaintiffs did not begin construction.

We believe that this evidence is sufficient evidence of duress to withstand defendants' motion for summary judgment. We make no decision on the merits of this case. We only hold that insofar as the allegations of duress are concerned there is sufficient evidence to withstand the motion for summary judgment.

## II.

The only remaining basis upon which a motion for summary judgment could possibly be granted in this case is on the theory of ratification. Defendants vigorously contend that plaintiffs ratified the 1972 agreement by keeping the land, by making payments, and by waiting approximately 20 months to file suit.

> "It is elementary that a transaction procured by . . . duress . . . may be ratified by the victim so as to preclude a subsequent suit to set the transaction aside. *May v. Loomis*, 140 N.C. 350, 52 S.E. 728; 25 Am. Jur. 2d, Duress and Undue Influence, §§ 28 and 41. It is equally clear, however, that an act of the victims . . . will not constitute a ratification of the transaction thereby induced unless, at the time of such act, the victim had full knowledge of the facts and was then capable of acting freely. [Citations omitted.]" *Link v. Link*, 278 N.C. at 197, 179 S.E. 2d at 706 and 707 (1971).

[4] The remedy in an action on a contract procured by duress is restitution. Unlike the victim of fraud, the victim of duress cannot affirm the contract and sue in tort. The victim of duress must

either affirm the contract or seek restitution. *May v. Loomis*, 140 N.C. 350, 52 S.E. 728 (1905); Dobbs, § 10.2. Additionally, some cases have suggested that the mere passage of time can amount to ratification. *E.g., Reed v. Exum*, 84 N.C. 430 (1881). Thus, there appears to be some merit in defendants' contentions.

[5] The first question presented is whether plaintiffs can prevail in this action inasmuch as they retained the property. In the more typical situation, retention of the property transferred as a result of the contract allegedly induced by duress would present a genuine problem. Here, however, plaintiffs, in essence, contend that they paid for property which was rightfully theirs in the beginning. Stated otherwise, plaintiffs contend that defendants forced them to pay for property of which they were the equitable owners while defendant Weaver only held bare legal title. In this instance, then, the restitutionary remedy would award plaintiffs *both* the property *and* the return of their funds. Thus, there is no inconsistency in plaintiffs' having retained the property and having sued for recovery of their funds. We note that the facts in this regard are in direct conflict. Plaintiffs assert that Michael Weaver held bare legal title. Defendants contend that plaintiffs had no interest in the property. Thus, the fact that plaintiffs have retained the property is not a sufficient basis upon which to grant summary judgment in this case.

[6] Insofar as the other acts are concerned, as we noted earlier, "*an act of the victim . . . will not constitute ratification of the transaction . . . unless, at the time of such act, the victim . . . was then capable of acting freely.* [Citations omitted.]" (Emphasis added.) *Link v. Link*, 278 N.C. at 197, 179 S.E. 2d at 706 and 707. Thus, even if payments were made over an extended period of time, there would be no ratification so long as the duress continued. This rule is a sound one. So long as the conditions which gave rise to the duress continue, the wrongdoer can continue to control the actions of the victim. Indeed, it may be easier to control the victim after the initial hurdle is crossed. Where, as here, the whole contract has been induced by duress, it is undoubtedly easier to induce a single payment if the duress continues. If the duress continues, there is no ratification.

In this case, defendant Michael Weaver had record title to the property. Plaintiffs contend that they had the equitable in-

terest in this property and that they were forced to enter into the 1972 agreement by Michael Weaver's refusal to transfer title to them as he was obliged to do. They contend that Weaver had threatened to destroy the project through control of the land. The undisputed evidence reveals that although Weaver transferred title to the property, he in the same transaction demanded and received a deed of trust securing payment of the notes given by plaintiffs in the transaction. Thus, defendants' power over the project continued. Plaintiff Carl Johnson testified under oath as follows:

> "As to why did I wait till December 31, 1973, to institute suit against Weaver Construction Company, after negotiating with Weaver and Weaver Construction Company over a year in an effort to get this project to a point that it could be constructed, after having been subjected to some rather trying times, after being fearful that I might see more of those, after being coerced into accepting an agreement that I felt was completely unreasonable, unfair, but having no other alternative, having entered into the agreement on behalf of Housing, Incorporated, I was fearful of the results of any opposition to Weaver's contract until such time as the project was closed, completed, and beyond any attack from the Weaver interests; I was so fearful that they might take and cloud the title to prevent closing of the project. . . . [T]hey had the control of the land in Mid East at that time and I had no alternative but to acquiesce or to succumb to the pressures. . . ."

If plaintiff's testimony is accepted as true, and, on motion for summary judgment, the nonmoving party's evidence must be considered favorably, that testimony is sufficient evidence of continuing duress to rebut any allegations of ratification. We also note that the Supreme Court in *Rose v. Materials Co., supra,* held that the victim of duress in that case had not ratified the agreement by his payments and acquiescence because the duress continued throughout the ten-year period of acquiescence. Thus, if it should be found that the defendants' power over plaintiffs continued throughout the period, plaintiffs' payments, acquiescence, and delay would not amount to ratification.

On the motion for summary judgment, the defendants had the burden of proving that there is no genuine issue as to any

material fact and that on the undisputed facts they are entitled to judgment as a matter of law. The record before us clearly indicates that they have failed to meet that stringent test. The record is replete with conflicts in the evidence. In ruling on a motion for summary judgment, those conflicts must be resolved in favor of the nonmoving party, in this case, the plaintiffs. When the evidence in this case is so viewed, it is clearly sufficient to withstand the motion for summary judgment. The motion should have been denied both as to plaintiffs' claim and defendants' counterclaim.

The judgment of the trial court is reversed and the case remanded for trial.

Reversed and remanded.

Judge ARNOLD concurs.

Judge MARTIN dissents.