HOUSING, INC.; MERHA, LTD.; AND CARL W. JOHNSON, PLAINTIFFS v. H. MICHAEL WEAVER; W. H. WEAVER CONSTRUCTION COMPANY; AND ALVIN H. BUTLER, TRUSTEE, DEFENDANTS AND LANDIN, LTD., ADDITIONAL DEFENDANT

No. 161A81

(Filed 4 May 1982)

1. **Rules of Civil Procedure §§ 50.4, 59— adjournment of term—amendment of judgment—entry of judgment n.o.v.**

    A trial court may alter or amend a judgment pursuant to G.S. 1A-1, Rule 59 and may enter judgment n.o.v. pursuant to G.S. 1A-1, Rule 50 (including the alteration of a judgment entered upon such a verdict) after the adjournment of the term during which the judgment was entered.

2. **Appeal and Error § 62.2— partial new trial on damages issue—liquidated damages—amendment of judgment**

    The trial court could properly set aside the jury's verdict on the issue of damages and grant a partial new trial on the issue of damages only without altering the verdict as to liability where the jury found that plaintiff was liable to defendant but awarded defendant no damages; the trial court erroneously instructed the jury that it could independently fix the defendant's damages at any amount it deemed appropriate when in fact the damages were liquidated; the jury was instructed specifically to answer the question of liability before

considering the issue of the amount of damages; it appears that the jury followed the trial court's correct instructions on liability and its incorrect instructions on damages; and the court's erroneous instructions on damages and the verdict thereon did not affect the jury's consideration of the liability issue. Furthermore, since the parties agreed that defendant's damages were liquidated, the partial new trial was unnecessary, and the trial court could properly enter judgment for the amount of the liquidated damages.

**3. Contracts § 3; Duress § 1— agreement to agree—threatened breach not economic duress**

The trial court properly concluded that a letter from defendant to plaintiff relating to joint development and construction of low-income housing units was a mere agreement to agree and not an enforceable contract and that a breach or threatened breach of its terms would not constitute economic duress which would void a subsequent agreement for the sale of defendant's interest in the project to plaintiff where the letter stated that it was a preliminary agreement subject to a more definitive agreement, and the letter did not contain all material terms of an agreement and did not specify a mode for settlement of the unresolved terms.

ON discretionary review of the decision of the North Carolina Court of Appeals reported at 52 N.C. App. 662, 280 S.E. 2d 191 (1981). From a judgment entered by *Jolly, Judge* on 19 June 1980 amending a judgment entered at the 26 November 1979 Civil Session of GUILFORD Superior Court, the plaintiff appealed. The Court of Appeals affirmed and the plaintiff petitioned this Court for discretionary review. Review was denied on 3 November 1981 and the plaintiff petitioned for rehearing, pursuant to Rule 31, Rules of Appellate Procedure. The petition for rehearing was allowed on 1 December 1981.

*Smith, Moore, Smith, Schell & Hunter, by Jack W. Floyd and Frank J. Sizemore III, for plaintiff-appellant.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by James T. Williams, Jr., Edward C. Winslow III and John H. Small for defendant-appellee.*

MITCHELL, Justice.

The plaintiff brought suit seeking, *inter alia*, to have a note declared void as the product of economic duress. The defendant counterclaimed for the value of the note, plus other damages. The jury found the plaintiff's defenses to liability under the note not to exist, yet awarded the defendant no damages. Following trial, the court set aside the verdict and the judgment it had entered

thereon, and entered judgment for the amount of the note plus other liquidated damages. The plaintiff contends that the Court of Appeals erred in affirming the trial court's judgment. For the reasons stated herein, we affirm.

This action was brought as a consequence of a dispute between two experienced and relatively sophisticated entrepreneurs who contemplated the joint development and construction of federally subsidized rental housing units in eastern North Carolina. The plaintiffs are Carl W. Johnson and two entities owned and controlled by him. Housing, Inc. is a corporation wholly owned by Johnson, and Merha, Ltd. is a limited partnership whose sole general partner is Housing, Inc. These entities collectively will be referred to hereinafter as "the plaintiff." The defendants include H. Michael Weaver and his corporation, W. H. Weaver Construction Company. These entities collectively will be referred to hereinafter as "the defendant."

In January of 1971, Carl Johnson became the sole owner of Housing, Inc. as a result of the severance of the interest of a former principal who had provided the corporation's construction capability. Housing, Inc. was left with four employees and less than $1500 in cash. The corporation had no working capital, no staff, no bonding capacity, and no construction capability. Housing, Inc.'s major asset was a letter of intent issued by the Mid-East Regional Housing Authority for the construction of 340 public housing units.

The Mid-East Regional Housing Authority was created to initiate and coordinate development of low-income housing through contracts administered and supported by the federal Department of Housing and Urban Development (HUD). The Regional Housing Authority performed its function by obtaining from HUD an Annual Contributions Contract which guaranteed annual payment of a fixed sum for a 20-year period following construction of the project. The Regional Housing Authority would then contract with a developer by means of a letter of intent. The developer's duty would be to locate and obtain appropriate land sites, obtain approval of sites, plans, and specifications, and build the project.

Housing, Inc. was incapable of completing the development of the 340 housing units in early 1971. In February, 1971, Johnson approached Weaver to propose that Weaver participate as a co-

owner and provide financing and construction capability in the
Mid-East project. The parties negotiated through April, 1971 and
specified their intentions in a letter from Weaver to Johnson on
21 April 1971. The letter, signed by Johnson as well as Weaver,
provided:

> Mr. Carl W. Johnson
> President
> Housing, Inc.
> Greensboro, North Carolina
>
> Dear Mr. Johnson:
>
> This letter will constitute a memoranda of our
> understanding with respect to a proposed joint venture be-
> tween W. H. Weaver Construction Company and Housing,
> Inc. for the development of housing for Mid East Regional
> Housing Authority. It is our intention to supplement this let-
> ter of understanding by a more definitive agreement as this
> matter develops, it being the intention of the parties that the
> problems which are incurred will be, within the framework of
> this understanding, worked out to the mutual benefit of the
> parties.
>
> We understand that Housing, Inc. has negotiated with
> Mid East Regional Housing Authority and that it has in hand
> letters of intention covering projects in Washington,
> Beaufort, Bertie, Hyde and Martin counties. We also under-
> stand that Housing, Inc. has secured options on lands in some
> or all of these counties covering lands which in your opinion
> will be suitable for the proposed housing.
>
> OWNERSHIP
>
> Housing, Inc. on the one hand and W. H. Weaver Con-
> struction Company, or its shareholders, on the other expect
> to form a joint venture. This joint venture may be in the
> form of a limited partnership or in the form of a corporation,
> as may be mutually agreed upon. The letters of intent and
> the options will be transferred by Housing, Inc. to the joint
> venture and the joint venture shall thereafter be the owner
> of the projects.

DIVISION OF RESPONSIBILITY

It is intended that both parties to the joint venture shall have active parts in the entire development of the projects and that both parties shall be kept informed of all developments and except as hereinafter agreed both parties shall sign all contracts and other agreements; however, it has been agreed that Housing, Inc. shall primarily be responsible for negotiation with Mid East Regional Housing Authority and that W. H. Weaver Construction Company shall be primarily responsible for the building of the projects. It is the intention of the parties that W. H. Weaver Construction Company will furnish all personnel required in the building of the projects, such as superintendents, and shall be responsible for the organization of the work with the sub-contractors and purchasing.

WORKING CAPITAL

(1) Prior to the closing of construction financing upon the property, working capital shall be contributed by W. H. Weaver Construction, or its shareholders, it being understood, however, that Housing, Inc. shall not be reimbursed for its predevelopment expenses until the closing of the construction loan. Housing, Inc. shall immediately, however, submit to W. H. Weaver Construction Company a statement of the expenses it has incurred to date together with a schedule of its outstanding commitments and obligations relative to the projects.

(2) Working capital after the execution of leases with Mid East Regional Housing Authority shall be furnished by borrowing from some bank or other financial institution which borrowing shall be arranged by and upon the credit of W. H. Weaver Construction Company. Working capital shall include all amounts expended under the provisions of subparagraph 1 of this section, all land costs and the sum of $50,000.00 which shall be advanced to Housing, Inc. upon the execution of the lease or leases as a part of its profit.

COMPENSATION OF W. H. WEAVER CONSTRUCTION COMPANY

W. H. Weaver Construction Company shall accomplish the building and shall be reimbursed for the actual costs of the project including job overhead and shall receive a fee of four (4%) per cent of the costs of construction, including job overhead to cover its home office overhead. This 4% shall be prior to the division of any profits.

PROFITS

Profits are hereby defined as the difference between the costs of all development and the amount which is borrowed upon the completed project. Profits shall be divided 30% to W. H. Weaver Construction Company and 70% to Housing, Inc..

LOSSES

Losses shall be divided 50% to W. H. Weaver Construction Company and 50% to Housing, Inc.

OWNERSHIP OF LAND

The completed projects shall belong one-half to W. H. Weaver Construction Company, or its shareholders, and one-half to Housing, Inc., or its shareholders.

POSSIBLE DIVISION OF PROPERTIES

It is the intention of the parties that after the projects have been completed and are being rented that the projects will be divided between the Weaver interests and the Johnson interests, so that the Weaver interests will own 100% of some of the projects and the Johnson interests will own 100% of the remainder of the projects, all within the framework that each is entitled to one-half of the completed projects.

WITHDRAWAL FROM VENTURE

Prior to May 15, 1971, either party may withdraw from this venture and all expenses incurred to the date of such withdrawal (not including land costs) shall be borne by the party which was advanced such expenses. In the event

Weaver interests have purchased lands for the project, Housing, Inc. shall have the right to purchase such lands from Weaver at costs plus any acquisition expenses, such as title fees, which have been advanced by Weaver.

SETTLEMENT

Upon the completion of the projects there shall be a complete financial settlement. In the event there be a loss, Housing, Inc. shall reimburse the joint venture for the initial advance of $50,000.00 plus its share of such loss.

In the event either party makes a disproportionate advance, which is not made good at such settlement, the party making such disproportionate advance shall be entitled to a lien upon the property of the joint venture for such sums so advanced.

Guarantees

Carl W. Johnson guarantees the obligations of Housing, Inc. and H. Michael Weaver guarantees the obligations of W. H. Weaver Construction Company.

If this memoranda is in accordance with your understanding, please indicate by signing in the lower left hand corner of this letter.

Yours very truly,

W. H. WEAVER CONSTRUCTION COMPANY
/s/ H. Michael Weaver

The above constitutes my understanding of the proposed joint venture.

/s/ Carl W. Johnson

Pursuant to the 21 April 1971 letter of intent, the parties cooperated on the Mid-East project throughout the summer. Both Johnson and Weaver attended a preliminary meeting with HUD officials in Atlanta. Johnson continued to maintain relations with HUD and to pursue acquisition of building sites. As options on the various sites became due, Weaver obtained financing and advanced funds to exercise Housing, Inc.'s options. Because the form of ownership of the joint venture had not been resolved, title to

the sites was taken in Weaver's name in his individual capacity. This simplified financing and security arrangements and avoided potentially unfavorable tax consequences. During the period extending from 14 June 1971 to 7 September 1971, Weaver took title to six of the eleven Mid-East sites in this manner.

While collaborating during the summer of 1971, the parties continued to negotiate the final form and terms of their relationship. They differed over three major items: (1) Weaver's compensation for construction of the project, (2) the nature of Weaver's obligation to obtain construction financing, and (3) the form of ownership of the project. Weaver propounded several proposals, each of which differed in some way from the 21 April 1971 letter. Johnson rejected all proposals and never made a counterproposal.

By late fall of 1971, both parties were cognizant of certain changes in their relative standings. Each re-evaluated his position *vis a vis* the other, and attempted to determine what action might be most lucrative. Johnson's position had improved in the sense that he had obtained sufficient working capital and potential investors to proceed without Weaver; yet his position had deteriorated in the sense that the Mid-East project was in jeopardy with HUD.

In December of 1971, Johnson began pressing for more favorable terms by consulting with another construction company and by demanding that Weaver return the land held in his name. Johnson was of the opinion that the land held in Weaver's name was being held in trust for Housing, Inc.; Weaver considered the land to be held in trust for a joint venture in which he owned a one-half interest. Beginning on 13 December 1971, Johnson directed the vendors of real estate subject to Housing, Inc.'s options to place the land titles in the name of Housing, Inc. instead of in the name of H. Michael Weaver. This reversal of prior practice was made without notice to Weaver.

The parties, continuing to reconsider their options, consulted their lawyers. The realization that the project would be more profitable for each without the other became more apparent. On 23 December 1971, Weaver signed a document granting Johnson the option to purchase Weaver's share of the project for $200,000. Johnson allowed this option to expire and offered Weaver $170,000 on 15 March 1972. On 25 April 1972, Weaver offered to

purchase Johnson's interest for $200,000. When Johnson declined, Weaver offered either to sell his interest or to buy Johnson's interest for $225,000. This offer Johnson also refused.

On 27 April 1972, the parties finally reached an agreement to sever their respective interests. Johnson agreed to purchase Weaver's portion of the venture for $212,500 plus Weaver's itemized costs of $58,421.94. Payment of the $212,500 was to be manifested by promissory notes of $70,000 and $122,500 and cancellation of a $20,000 debt. Notes and deeds of trust securing payment of the amounts specified in the 27 April 1972 agreement were executed on 14 July 1972 and, concurrently, title to the land held by Weaver was transferred to Housing, Inc.

Johnson's first payment of $20,000 was made 14 July 1972 by cancelling Weaver's remaining indebtedness on a project purchased from Johnson. Johnson paid Weaver $18,421.94 on 8 September 1972, and $83,333 on 3 October 1972. These payments cancelled the $70,000 promissory note and reduced the unpaid expenses to $26,667.

With Weaver out of the project, Johnson proceeded alone with development. Johnson formed a limited partnership, Merha, Ltd., on 22 June 1972. The sole general partner of Merha, Ltd. was Housing, Inc. Johnson sold half of the Mid-East project to Merha, Ltd. and marketed 95% of Merha, Ltd. to the limited partners for $250,000. As development proceeded, Johnson fell into disputes with his building contractor and his construction lender. The contractor walked off the project and the lender foreclosed. Johnson sued the contractor and collected $175,000. In response to foreclosure, he formed Landin, Ltd., a corporation in which he owned all the stock. Landin, Ltd. purchased Mid-East from Housing, Inc. for $1000 at foreclosure. Acting through Landin, Ltd., Johnson hired a new contractor and completed the Mid-East project at a substantial profit. Although Housing, Inc. reported a tax loss of $104,496 on the Mid-East project, Landin, Ltd. reported a taxable gain of $778,152 on the same project.

The final Housing, Inc. note for $122,500 payable to the defendant came due on 1 January 1974. Instead of paying off the note, the plaintiff sued the defendant on 31 December 1973.

The plaintiff sought damages of $63,333 (the amount already paid the defendant in excess of the defendant's actual expenses of

$58,421.94), and prayed that the note for $122,500 and the deed of trust securing it be set aside as null, void and of no legal effect. The plaintiff alleged that the defendant procured the 1972 agreement by means of duress and breach of an express trust. The defendant counterclaimed for recovery of $122,500 on the note and $76,667 (principal and interest) on the balance of the 27 April 1972 agreement.

The defendant moved for summary judgment on both the claim and counterclaim. The trial court, *Collier*, Judge, entered summary judgment in favor of defendant on 11 May 1977. The Court of Appeals reversed and remanded for trial. *Housing, Inc. v. Weaver*, 37 N.C. App. 284, 246 S.E. 2d 219 (1978). This Court, in a *per curiam* opinion, affirmed. *Housing, Inc. v. Weaver*, 296 N.C. 581, 251 S.E. 2d 457 (1979).

On remand, at the conclusion of an extensive trial, the trial judge informed the parties that he would not instruct the jury on breach or threatened breach of contract as a possible form of duress, because it had concluded as a matter of law that the 21 April 1971 letter was not an enforceable contract. Both parties filed proposed jury issues. Neither requested that an issue regarding the amount of the defendant's damages be submitted. Although the uncontradicted evidence indicated that the defendant's damages were liquidated at $149,167 (the $122,500 note plus $26,667 unpaid expenses), the trial court submitted an issue regarding the defendant's damages. The five issues submitted to the jury asked:

1. Prior to execution of the letter agreement dated April 27, 1972, was defendant H. Michael Weaver under a duty to convey to Housing, Inc., title to the lands acquired by him through the exercise of options owned by Housing, Inc.?

2. At the time of execution of the agreement dated April 27, 1972, and the promissory notes and assignment thereafter executed, were the plaintiffs Carl Johnson and Housing, Inc., acting under duress, coercion or business compulsion from defendant H. Michael Weaver, as alleged in the complaint?

3. If so, did plaintiffs Carl Johnson and Housing, Inc. ratify the April 27, 1972 agreement and the promissory notes and assignment thereafter executed, by their subsequent conduct?

4. If you have found in favor of the plaintiffs as to the foregoing issues, what amount of restitution are plaintiffs entitled to recover from defendant H. Michael Weaver?

5. If you have found in favor of the defendants as to the foregoing issues, what amount are the defendants entitled to recover of the plaintiffs?

The trial court instructed the jurors that they should answer the liability issues first, and then proceed to the damages questions. In regard to the fifth issue, the trial court instructed that the figure that all the evidence tended to show was $149,167. If the jury disbelieved the evidence, the trial court instructed that the jury could use any other figure it deemed appropriate.

The jury answered the first two issues in the negative, indicating that the plaintiff was liable to the defendant. On the fifth issue, the jury found that the defendant should recover no damages as a consequence of the plaintiff's liability.

The next day, after a discussion with both attorneys and at the insistence of the plaintiff's attorney, the trial court entered judgment in accordance with the jury's verdict. The trial judge stated that the judgment was being entered merely as a mechanical matter to avoid potential clerical problems, and that he had not yet determined what to do regarding the fifth issue relating to the amount of the defendant's damages. The judgment was filed 13 December 1979.

On 20 December 1979, the defendant filed motions for judgment notwithstanding the verdict, for amendment of the judgment, or for a new trial. The plaintiff filed a similar motion on the same day. The trial court entered a "final judgment" on 19 June 1980. This judgment denied both of the motions of the plaintiff. The jury verdict as to the fifth issue was vacated and set aside, and judgment was entered in favor of the defendant against the plaintiff in the amount of $215,866.57, representing the principal sum of the note of $122,500 plus interest specified in the note at the rate of 8-1/8 per cent, plus reimbursable expenses of $26,667. In the alternative, the trial court granted the defendant's motion for a partial new trial on damages only.

The Court of Appeals affirmed. *Housing, Inc. v. Weaver*, 52 N.C. App. 662, 280 S.E. 2d 191 (1981). This Court denied discre-

tionary review on 3 November 1981. The plaintiff petitioned pursuant to Rule 31, Rules of Appellate Procedure, for rehearing. The petition for rehearing was allowed 1 December 1981.

[1]    Although not addressed by the parties in the briefs, an initial issue raised by the plaintiff in the petition for discretionary review was whether the trial court erred by amending a judgment after the adjournment of the term. The record does not indicate when the trial judge adjourned the 26 November 1979 Session of Guilford County Superior Court. He did hold court in New Hanover County the week following the 13 December 1979 judgment, so it must be presumed that he adjourned the term of court before 17 December 1979. The amended judgment was signed 19 June 1980 and filed 24 June 1980.

The unquestioned rule in this State has long been that, although during a term all judgments and orders are *in fieri* and may be amended, once a trial judge has adjourned court and left the bench for that term, he cannot modify a judgment entered during that term. *Shaver v. Shaver*, 248 N.C. 113, 102 S.E. 2d 791 (1958); *Pendergraph v. Davis*, 205 N.C. 29, 169 S.E. 815 (1933); A. MCINTOSH, NORTH CAROLINA PRACTICE AND PROCEDURE § 1712 (T. Wilson and J. Wilson 2d ed. 1956). The parties attempted to stipulate that the judgment could be entered out of term. Although all parties to an action may consent to entry of a judgment out of term, once a judgment is entered and the term has expired, the judgment becomes final and cannot be amended out of term despite the parties' consent to entry out of term. *Crow v. McMullen*, 220 N.C. 306, 17 S.E. 2d 107 (1941). Since the court entered judgment 13 December 1979, the amendment of the judgment out of term on 19 June 1980 would have been void if the long-standing rule applied. It does not.

In 1967, the legislature enacted the North Carolina Rules of Civil Procedure. 1967 N.C. Sess. Laws, c. 954. Rule 50(b) of the North Carolina Rules of Civil Procedure, G.S. 1A-1, provides for judgment notwithstanding the verdict, and Rule 59(e) provides for altering or amending a judgment. The plaintiff's motions were couched in the alternative; therefore both rules will be considered. Rule 50(b) allows a party to move for judgment n.o.v. within 10 days after entry of judgment, or the judge on his own motion may grant judgment n.o.v. within 10 days after entry of

judgment. No time is specified for judicial action upon a timely motion by a party. Rule 59(e) requires a party to serve a motion to amend or alter a judgment within 10 days after entry of judgment. No time is specified for judicial action upon such a motion.

The failure to specify statutorily the time for judicial action on a motion for judgment n.o.v. or on a motion to amend a judgment has been the source of some confusion. If the old rule were still in effect, a motion within 10 days of judgment but after the adjournment of the term would be nugatory. Yet no other limitation can be found. The confusion has prompted one commentator to state that the old rule does not apply and the new time limit for judicial action is the same 10 day span given the parties to file their motions. W. SHUFORD, NORTH CAROLINA CIVIL PRACTICE AND PROCEDURE § 59-18 (2d ed. 1981).

We do not think that the legislature, in delineating the precise time periods of Rule 50(b) and Rule 59(e), could have intended that these specific periods might be curtailed by the adjournment of the term of court at which judgment was rendered. To attribute any such intent to the legislature would vitiate the purpose of both rules. *Cf.* Rule 6(b) of the Rules of Civil Procedure, which expressly prohibits the *enlargement* by consent of the time periods specified in Rule 50(b) and Rule 59(e). Therefore, a trial court may alter or amend a judgment pursuant to Rule 59 and a trial court may enter judgment n.o.v. pursuant to Rule 50 (including the alteration of a judgment entered upon such a verdict) after the adjournment of the term during which the judgment was entered.

The time for judicial action upon a motion under Rule 50 and Rule 59 is not prescribed. We think the view expressed in W. SHUFORD, NORTH CAROLINA CIVIL PRACTICE AND PROCEDURE § 59-18 (2d ed. 1981) misconstrues the language of Rule 59(e). This rule and Rule 6(b) do not circumscribe the trial court's authority to rule on a timely motion to alter or amend a judgment; they merely require that a party make such a motion within 10 days after judgment or require that a trial court acting on its own motion amend judgment within 10 days after its entry. The treatise's implication that a trial court's ruling on a timely motion by a party under these Rules must also be made within 10 days after entry of the original judgment must be discounted.

We find that the amendment of the 13 December 1979 judgment by entry of judgment on 19 June 1980 was not invalid on grounds that the subsequent judgment was entered out of term.

[2]   The plaintiff first assigns as error the holding of the Court of Appeals that the trial court could vacate the jury verdict and amend the judgment as to the issue of damages without altering the verdict and judgment as to liability. The plaintiff cites *Weyerhaeuser Co. v. Supply Co.*, 292 N.C. 557, 234 S.E. 2d 605 (1977) and *Robertson v. Stanley*, 285 N.C. 561, 206 S.E. 2d 190 (1974) for the proposition that courts should not grant a new trial for damages alone "unless it is clear that the error in assessing damages did not affect the entire verdict." 292 N.C. at 561-62, 234 S.E. 2d at 607; 285 N.C. at 568, 206 S.E. 2d at 195. The plaintiff contends that when the liability and damages issues are interwoven, the trial court may not arbitrarily set aside the verdict and grant a new trial on solely the damages issue. Although the plaintiff's contention is certainly based upon an accurate recital of the law, the decisions cited do not mandate that this case be remanded for retrial on all issues.

*Robertson v. Stanley*, cited with approval in *Weyerhaeuser Co. v. Supply Co.*, 292 N.C. 557, 234 S.E. 2d 605 (1977) is the authoritative precedent regarding the granting of partial new trials. The initial observation of *Robertson* was that "it is entirely discretionary with the Court, Superior or Supreme, whether it will grant a partial new trial." 285 N.C. at 568, 206 S.E. 2d at 195. The trial court in *Robertson* had denied the plaintiff's motion for a partial new trial on grounds that the jury's verdict of liability but no damages was inconsistent and contrary to the instructions of the trial court. This Court, in reversing the trial court, then had to determine whether to grant a new trial on all issues or solely on the damages issue. It exercised its discretion to order a new trial on all issues. *Id.* at 569, 206 S.E. 2d at 196.

In contrast, the trial court exercised its discretion to set aside only the damages issue in the case *sub judice*. The issue before this Court is not whether it would have granted a new trial on one issue or on all issues had it confronted the question as it did in *Robertson*. In the instant case, the trial court has already answered this issue and our inquiry is limited to whether the trial court abused its discretion.

The trial court, by its own admission, erred in instructing the jury that it could find damages for the defendant at any *"such other figure as you deem appropriate."* There was actually no question of fact concerning the amount of the defendant's damages. The damages due were the face amount of the note, plus interest as specified on the note, in addition to unpaid reimbursable expenses. Neither party requested that the jury be submitted an issue as to the amount of the defendant's damages, and the parties now agree that damages are liquidated. The jury should have been instructed to determine solely the liability issue or it should have been instructed to return damages of $149,167 plus interest in the event it found liability.

All parties concurring that there was error in the judge's instructions, the dispute centers on the propriety of the devised remedy of setting aside only the damages verdict. In determining whether the trial court abused its discretion, *Robertson v. Stanley* is instructive. A partial new trial should be ordered when the error "is confined to one issue, which is entirely separable from the others and it is perfectly clear that there is no danger of complication." 285 N.C. at 568, 206 S.E. 2d at 195. Justice Huskins, writing for a unanimous Court, quoted with approval from 58 Am. Jur. 2d. *New Trial,* §§ 25, 27 (1971):

> As a condition to the granting of a partial new trial, it should appear that the issue to be tried is distinct and separable from the other issues, and that the new trial can be had without danger of complications with other matters. Particularly is this true where the error in the verdict relates to the amount of damages assessed and it appears that this error was not the result of any ruling by or charge from the trial judge, but was committed solely by the jury itself after retiring to consider its verdict; in such a case it is difficult to say that the entire verdict was not affected by the cause from which resulted the error in the amount of damages.

> Where it appears that the verdict was the result of a compromise, such error taints the entire verdict and requires a new trial as to all of the issues in the case. If the award of damages to the plaintiff is 'grossly inadequate,' so as to indicate that the jury was actuated by bias or prejudice, or that the verdict was a compromise, the court must set aside the verdict in its entirety and award a new trial on all issues.

285 N.C. at 568-569, 206 S.E. 2d at 195-96. Justice Huskins also quoted from Annot., 29 A.L.R. 2d 1199 (1953) that "[a] new trial as to damages alone should not be granted where there is ground for a strong suspicion that the jury awarded inadequate damages to the plaintiff as a result of a compromise involving the question of liability." 285 N.C. at 569, 206 S.E. 2d at 196.

Unlike the case at bar, in *Robertson* there were grounds for such a suspicion. In *Robertson* we were required to presume that the jury was instructed correctly because the instructions were not brought forward as a part of the record on appeal. Had the jury in *Robertson* followed the trial court's instructions it would have arrived at an internally consistent verdict. Therefore, the paradoxical verdict in that case was almost certainly the result of bias, prejudice or a jury compromise. In contrast, error in the portion of the trial court's instructions on the amount of the defendant's damages in the instant case is conceded by all parties and was recognized by the trial court itself after the verdict was returned. The jurors were instructed erroneously that they could independently fix the defendant's damages at any amount they deemed appropriate. The jurors were instructed further specifically to answer the question of liability *before considering the issue of the amount of damages.* They answered the first two issues by finding the defendant was under no duty to convey the property to the plaintiff prior to the 27 April 1972 agreement and that the plaintiff did not enter that agreement as a result of duress, coercion or business compulsion.

The jury reached a verdict entirely consistent with the trial court's instructions — both those correct and those erroneous. By so deciding the first two issues, the jury determined that the plaintiff was liable to the defendant and then considered the issue of the damages due the defendant. The trial court had instructed the jury erroneously that it could award any damages it deemed appropriate. This had the effect of allowing the jury to fix the amount of damages in its complete and unfettered discretion; it awarded zero damages.

The discrepancy between the portion of the verdict establishing the plaintiff's liability and the portion of the verdict awarding zero damages did not likely spring from a compromise verdict, bias or prejudice, as it did in *Robertson.* In contrast to

*Robertson,* the jury's verdict was compatible with the court's instructions. Under the peculiar facts of this case, the internally inconsistent verdict based upon an erroneous instruction does not imply that the jury acted improperly in resolving the issues. To the contrary, from all indications the jury diligently followed the trial court's correct instructions on liability, and just as diligently followed its incorrect instructions on damages.

The trial court had the opportunity to observe the jury and did not abuse its discretion by refusing to find under the facts of this case that the erroneous damages instruction and verdict thereon affected the jury's consideration of the liability issue and somehow "tainted" that portion of the verdict. The two issues, as presented to the jury, were not interwoven. The damages portion of the verdict was properly vacated and set aside and a new trial solely on that issue would have been appropriate. Since the parties agreed that the defendant's damages were liquidated, such a trial was unnecessary. The trial court correctly entered judgment for the liquidated damages.

[3] The plaintiff's second assignment of error stems from the trial court's refusal to submit to the jury the issue of breach or threatened breach of contract as a possible form of economic duress. The trial court concluded as a matter of law that the 21 April 1971 letter was an "agreement to agree" and thus did not constitute an enforceable contract. Threatened breach of its terms therefore would not rise to the level of legal duress necessary to void the 27 April 1972 contract.

*Boyce v. McMahan,* 285 N.C. 730, 208 S.E. 2d 692 (1974), is the definitive decision on agreements to agree. "A contract to enter into a future contract must specify all its material and essential terms." *Id.* at 734, 208 S.E. 2d at 695. "If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." *Id. Boyce* controls the case at bar. In both, the original agreements were embodied in documents which recited on their face that they were preliminary agreements subject to more definitive agreements to be executed subsequently. Both agreements specified the intentions and desires of the parties rather than their agreement. *Boyce's* requirement of agreement as to all material terms was not fulfilled by the document in this case. For example, the parties did not

agree on the form of ownership of the project. Neither did the 21 April 1971 letter specify a mode for settlement of these unresolved terms. The trial court thus correctly determined that the 21 April 1971 letter was a mere agreement to agree and breach of its terms would not rise to the level of economic duress necessary to void the 27 April 1972 agreement.

The plaintiff contends that the original decision of the Court of Appeals reversing summary judgment *a fortiori* held that there were questions of fact as to economic duress. The decision now under review, holding that the 21 April 1971 letter was no basis for submission to the jury of an issue of economic duress, thus presents at first glance an apparent inconsistency between two panels of the Court of Appeals. We note, however, that the decisions were based upon different records. The decision reversing summary judgment was grounded upon a mere forecast of evidence to be presented at trial. The latter decision, entered following a jury verdict, was based upon evidence actually admitted at the trial granted by the former decision. Therefore, the law of the case did not irrebuttably indicate the existence of a factual question as to economic duress.

The trial court correctly determined that the 21 April 1971 letter was a mere agreement to agree and breach of its terms would not amount to economic duress rendering the 27 April 1972 contract voidable. The court properly refused to submit a jury issue on breach or threatened breach of contract as a means of duress.

The plaintiff lastly assigns that the trial court's instructions on the liability issue erroneously (1) allowed the jury to find a joint venture implied-in-fact, (2) prevented jury consideration of a duty to reconvey in the event it found a joint venture implied-in-fact, and (3) prevented jury consideration of the equitable principles of restitution, constructive trust, and resulting trust. We have carefully examined the trial court's charge contextually and in its entirety, as is required of us, and find no error requiring reversal of the decision of the Court of Appeals.

Our review of the record impels the conclusion that the decision of the Court of Appeals affirming the judgment entered by the trial court must be, and the same is

Affirmed.