JDH Capital, LLC v. Flowers, 2009 NCBC 4.

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 07 CVS 5354 |

JDH CAPITAL, LLC,

       Plaintiff,

    v.

REBECCA D. FLOWERS, DWF
DEVELOPMENT, INC., and
FLOWERS PLANTATION
FOUNDATION, INC. f/k/a
FLOWERS PLANTATION, INC. ,

       Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
PLAINTIFF'S MOTION FOR LEAVE TO
AMEND COMPLAINT**

{1}    This matter is before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Motion for Leave to Amend the Complaint. This Opinion, and the Court's decision in *Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc.*, 2009 NCBC 5 (N.C. Super. Ct. Mar. 13, 2009) (hereinafter "*Crockett*"), entered contemporaneously, both address the requirements necessary to create a binding contract.[1] Both cases involve real estate development. Plaintiff in this case seeks damages for breach of contract. Plaintiff in *Crockett* seeks specific performance of certain terms of the contract, as well as damages.

{2}    In each case, Defendants assert that there is no enforceable agreement, only an agreement to agree at a later date. Because the legal standards and the factors to be considered are the same in both cases, the Court will address them in identical fashion. The application of those standards and factors will be addressed within the context of the facts in each case and the differing standards for summary judgment and motions to dismiss for failure to state a claim. This case involves an

---

[1] *Crockett* is decided on a Rule 12(b)(6) motion.

additional question of whether, how, and when *quantum meruit* claims may be created in circumstances where there is an unenforceable agreement to agree.

{3}    For the reasons set forth below, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment on all issues.

> *Johnston, Allison & Hord by Daniel A. Merlin, Martin L. White, and Robert L. Burchette for Plaintiff JDH Capital, LLC.*
>
> *Manning, Fulton & Skinner, P.A. by William S. Cherry, III and Michael T. Medford for Defendants Rebecca D. Flowers, DWF Development, Inc., and Flowers Plantation Foundation, Inc.*
>
> *Armstrong & Armstrong, P.A. by L. Lamar Armstrong, Jr. for Defendants Rebecca D. Flowers, DWF Development, Inc., and Flowers Plantation Foundation, Inc.*

Tennille, Judge.

## I.

### LEGAL STANDARD

{4}    This case is before the Court on summary judgment. Discovery was extensive and is complete. The Court is thus applying the standard of review applicable to summary judgment.

{5}    Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.R. Civ. P. 56(c). "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues exist." *Id.* at 56 cmt. The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). The Court

must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

## II.
### FACTS

{6}    Analysis of the facts in this case begins with the parties and their relationship to each other.  Rebecca D. Flowers ("Flowers") is the owner of an undeveloped twenty-eight (28) acre tract of land at the intersection of Highway 42 and Buffalo Road in Johnston County.  The twenty-eight (28) acre tract has been in her family for generations.  Prior to 2005, Flowers had been developing other nearby property owned by her as a residential development known as Flowers Plantation.  Flowers controlled all aspects of the residential development of her property.  She was not interested in selling the twenty-eight (28) acre tract.

{7}    As of 2005, Flowers had considered building a commercial/retail center on the tract and had some architectural plans drawn for a "Marketplace" center.  While Flowers had experience with residential development, she did not have experience with commercial development.  Furthermore, Flowers had never worked with a professional real estate developer.  In fact, according to Plaintiff, Flowers was inexperienced and naïve when it came to commercial development.  (Hill Dep. (Vol. I) 77:3–78:7, Dec. 19, 2007.)  Flowers used Len Woodall ("Woodall"), an independent certified public accountant in Raleigh, as an accountant and business advisor and to assist her in negotiations.

{8}    JDH Capital, LLC ("JDH") is in the business of developing commercial property.  According to its counsel's oral argument and its President's deposition, it is one of the best, if not the best, commercial developers in the Southeast.  JDH has vast experience in developing commercial sites of various kinds.

{9}    JDH regularly seeks out development opportunities in which it can own and/or manage the property once it is developed.  JDH has experience developing commercial real estate through joint venture agreements.  In fact, JDH has at least two (2) law firms that regularly assist it in the creation of legal documents involving

its business. JDH's officers and other personnel are sophisticated businessmen and businesswomen. JDH employs agents who actively look for property to purchase for development purposes. Those agents saw Flowers' tract and approached Flowers about purchasing it.

{10} Flowers initially told JDH that she was not interested in selling her property. She did, however, indicate a willingness to look at a possible joint venture with JDH, and discussions between the two (2) parties followed. In concept, Flowers would contribute her property to the joint venture, and JDH would provide the services and expertise to design, build, and obtain financing for the development.

{11} The nature of real estate development makes drafting contracts more difficult. Various contingencies can have material impacts on the viability of a specific development project. Zoning problems, environmental issues, interest rates, access to, and cost of, capital, and construction costs are all examples of variables that may not be known at the time parties begin negotiations or sign letters of intent.

{12} Joint ventures are frequently used in real estate development and management. Those joint ventures are generally governed by lengthy and detailed operating agreements. By its nature, real estate development must be flexible. It is difficult to reach an agreement until all the variables are known or one party agrees to bear the risks associated with a particular variable.

{13} In addition to the normal problems associated with real estate development, the Flowers/JDH negotiations presented several unique problems. First, there was a disparity of expertise between the parties. Flowers was not familiar with joint ventures or commercial development. Second, and most importantly, Flowers retained her nearby residential property, and she had a particular interest in the commercial project fitting in with, and being beneficial to, her remaining property. Third, since the property had been in her family for generations, Flowers had a personal interest in what happened with the development. Architectural control was a key issue for Flowers. These personal

issues were known to JDH before the Letter of Intent was signed on March 30, 2006.

{14} Several significant things occurred during the initial negotiations and prior to the signing of the Letter of Intent. In particular, the parties had differing views of what the commercial development would be. Flowers sent JDH plans she had drawn up for a "Marketplace" commercial center. Conversely, JDH sent Flowers commercial development plans centered on a grocery store as the anchor tenant. JDH furnished Flowers with site plans and other ideas in order to convince her that she was better off doing a joint venture with JDH, as opposed to developing the tract herself. Prior to the signing of the Letter of Intent, JDH had disclosed its position that one (1) of three (3) specific grocery store chains, including Lowe's Foods, should be the anchor tenant. All of these disclosures were made prior to the signing of any agreement in order to demonstrate JDH's expertise. JDH proposed to Flowers that an LLC be formed to own and operate the center.

{15} JDH authored the first draft of the Letter of Intent to be executed by the parties. The first draft, as well as the final draft, contained the following language prepared by JDH:

> Both parties agree to work diligently toward the full execution of limited liability company documents reflecting the terms and conditions agreed upon herein within 30 days of the date of this agreement.
>
> This Letter of Intent does not create any binding, contractual rights between Flowers and JDH and shall serve only as an expression of intention between the parties.

(Letter of Intent, March 30, 2006, at 3.) JDH chose to call the document a "Letter of Intent." Neither the description of the document nor the language quoted above was proposed by Flowers.

{16} The final executed version of the Letter of Intent was dated March 30, 2006. Significantly, it was contemplated that the final operating agreement for the LLC would be completed within thirty (30) days. JDH, the expert in developing commercial property by way of joint ventures, had the responsibility for getting the

requisite documents drafted.  Had the parties adhered to the thirty (30)-day schedule and reached either an agreement or an impasse, it is unlikely this case would be pending.  However, no draft of an LLC agreement was circulated until July 20, 2006, almost four (4) months later.  Importantly, the Letter of Intent made no provision for any right or remedy in the event the negotiations that were to follow were not successful.

{17}  Many significant items were not agreed upon at the time the Letter of Intent was signed.  Agreement on those significant items, as well as other smaller items, was to be finalized in the written LLC agreement.  Agreement on several of the critical issues impacted decisions on other critical issues.  For example, Flowers wanted, and was granted, final architectural control.  Approval of the final architectural plan, however, was still subject to agreement on a budget for the project.  When the Letter of Intent was signed, no final agreement on an architectural plan or a budget had been reached.  Thus, Flowers' concerns over control of the architectural plan were not satisfactorily addressed at the time the Letter of Intent was signed.  Moreover, when the Letter of Intent was signed, no agreement had been reached as to the value of Flowers' property to be contributed to the LLC.  That value would impact many of the provisions in the final agreement.

{18}  The final proposed operating agreement produced by JDH was forty-two (42) pages long—thirty-eight (38) more than the Letter of Intent.  Moreover, the final proposed operating agreement contained many material provisions not covered by the Letter of Intent.  Among the material provisions which differed from, were added to, or omitted from, the Letter of Intent were the following:

- detailed provisions on management of the LLC;
- a provision for sales commissions on sales of any portion of the tract;
- provisions for Rights-Obligations of members;
- detailed provisions governing capital calls and loans, including provisions that permitted JDH to determine when Flowers had to make capital contributions;

- Flowers' right to succeed as managing member if JDH sold its membership;
- specific terms for allocation of profits, losses, and other allocations;
- distribution provisions;
- buy-sell provisions;
- provisions governing dissolution and liquidation; and
- new representations and warranties.

(Defs.' Br. Supp. Mot. Summ. J. 7–8.) Interestingly, the proposed operating documents contained a provision which permitted JDH to withdraw from the LLC before Flowers' property was contributed and recover its expenses if Flowers sold the property within eighteen (18) months of JDH's withdrawal. The lengthy LLC provisions were not unusual. The documentation necessary for development and operation of a commercial real estate joint venture is substantial and often contains many material provisions that need to be agreed upon. It would be unusual, if not impossible, for a commercial joint venture, such as that contemplated by the Letter of Intent, to be formed and operate without such detailed agreements.

{19} Other important issues remained unaddressed when Flowers declined to proceed with the joint venture. JDH was to provide the guarantee for the financing of the project. Flowers, through Woodall, had taken the position that no binding agreement would be signed without JDH first providing its financial information. That information was never made available.

{20} Flowers took actions that were consistent with her ability to withdraw before a final agreement was signed. She took responsibility for, and paid the cost of, obtaining licenses, permits, zoning changes, and other governmental improvements. Typically, such activities would have been performed by the developer. Flowers also contracted directly with a civil engineer, who drew up plans for the site. Furthermore, Flowers got a referendum passed permitting the sale of beer and wine on the tract once a grocery store was located on the property.

{21} Other points of contention arose. For example, when JDH proposed a budget, Flowers learned, for the first time, that JDH had contracted out certain

work it was to do and then included charges for that work in the budget. Reasonably, Flowers disagreed with that portion of the budget. There were also issues surrounding architectural additions. Ultimately, no agreement could be reached on the architectural additions Flowers wanted.

{22} Flowers expressed concern over JDH's delay in obtaining tenants for the property and its failure—in her view—to have a leasing agent on site. Flowers also expressed overall concern about JDH's commitment to the project.

{23} For its part, JDH had prepared development plans and, most importantly, had what it believed was a commitment from Lowe's Foods to be the anchor grocery store tenant, although no lease had been signed. In reality, neither JDH nor Flowers had a binding commitment from Lowe's Foods. JDH did have people working on prospective tenants, although no leases had been negotiated. Its lawyers were working on the LLC documentation, albeit slowly. No financing had been secured. Many of the tasks JDH was to perform, however, depended upon the execution of an LLC agreement and ownership by the joint venture of the property to be developed.

{24} At the time the summary judgment motion was argued, the property had not been developed by Flowers. Although Lowe's Foods had continued to express interest in a lease, no lease had been signed.

{25} During the period following the execution of the Letter of Intent, Flowers, or her representative, expressed her belief that there was no binding agreement in place between Flowers and JDH. In addition to Mr. Woodall's communications that there could be no binding agreement until JDH's financials were received, Flowers sent emails to JDH on September 19, 2006, September 27, 2006, October 4, 2006, and October 13, 2006, each of which indicated that no final agreement had been reached. JDH did not dispute her assertions. Flowers ultimately declined to sign the proposed LLC agreement and declined to go forward with the joint development.

III.

ANALYSIS

A.

THE LETTER OF INTENT

{26}   The first question presented is whether there was a binding written agreement to form a joint venture, the breach of which would permit Plaintiff to recover damages.  On summary judgment the Court is not limited to reviewing just the terms of the document at issue or the allegations in the complaint as it would be on a motion to dismiss.  *See* N.C.R. Civ. P. 56(c).  Here, the Court has also considered the undisputed facts, including the sophistication and relationship of the parties.

{27}   Flowers had no experience with joint ventures or development of commercial real estate.  Her experience was limited to the development of residential property owned by her family.  Flowers had a strong emotional tie to the property, and she did not want to sell it.  Flowers had no prior dealings with, and did not know, JDH or any of its officials.  It was therefore logical that she would proceed cautiously by entering into a non-binding preliminary agreement until a more detailed and comprehensive agreement could be executed.  Moreover, it was logical for Flowers to proceed cautiously knowing that the commercial development would significantly impact her separate residential property.

{28}   When JDH proposed the Letter of Intent, it was aware of Flowers' concerns, her personal attachment to the property, and her separate residential development.  Thus, the relationship of the parties and the circumstances surrounding execution of the Letter of Intent support the finding that it was not intended to be a binding agreement, but was subject to further negotiation and documentation.

{29}   The document itself supports a finding that it was a non-binding agreement.  This case falls squarely within the holding of this Court in *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consolidated*, 2003 NCBC 3 (N.C. Super. Ct. Apr. 28, 2003),

http://www.ncbusinesscourt.net/opinions/2003%20NCBC%203.htm (holding that a letter of intent was not a valid or enforceable contract). The Letter of Intent here is similar to the Letter of Intent in *Durham Coca-Cola* in that (1) the document in this case says on its face it is a letter of intent and that it is non-binding, (2) the document contemplates the execution of a more complete agreement, (3) there is no language inferring an intent to be bound, and (4) a comparison of the length of the Letter of Intent and the proposed joint venture agreement demonstrates the numerous material terms yet to be determined when the Letter of Intent was signed. As this Court pointed out in *Durham Coca-Cola*:

> The acceptance of a proposal to make a future contract, the terms of which are to be subsequently fixed, is not binding. In *Boyce*, our Court of Appeals made it clear that an agreement "made expressly subject to a future agreement" is not enforceable, even if the parties intended the document to be a final agreement. By its own terms, the writing in *Boyce* was incomplete and subject to supplementation by a more detailed agreement. Furthermore, "[a]n offer to enter into a contract in the future must, to be binding, specify all the essential and material terms and leave nothing to be agreed upon as a result of future negotiations."
>
> . . . .
>
> The outward manifestations of intent indicate that the parties did not intend for the [Letter of Intent] to be the final, complete agreement of the parties; the language within the agreement, the behavior of the parties before signing the [Letter of Intent], and the behavior of the parties after signing the [Letter of Intent] all indicate that there was no mutual assent; thus, the [Letter of Intent] was not a contract.

*Durham Coca-Cola*, 2003 NCBC 3, ¶¶ 37, 46 (*quoting Boyce v. McMahon*, 22 N.C. App. 254, 258, 206 S.E.2d 496, 499, *aff'd*, 285 N.C. 730, 208 S.E.2d 692 (1974)) (internal citations omitted).

{30} There is no doubt that material terms were addressed in the proposed joint venture agreement that were not addressed, or not addressed in significant detail, in the Letter of Intent. Where material terms are omitted from an agreement and

must be supplied by the court, the agreement is unenforceable. *See Boyce*, 285 N.C. at 735, 208 S.E.2d at 695.

{31}   The economic reasons courts should decline to fill in material gaps left open by contracting parties is cogently addressed by Judge Richard A. Posner in his article, "The Law and Economics of Contract Interpretation," 83 Tex. L. Rev. 1581 (2005):

> The tradeoffs in deciding whether to create a gap filler have been recognized for a long time. The benefits are savings in contractual transaction costs. Instead of parties to dealership contracts having to insert a best-efforts clause in every contract, the court interpolates such a clause in just the tiny fraction of contracts that are drawn into litigation in which an issue concerning the adequacy of the dealer's efforts arises. The costs of judicial gap filling are the error and administrative costs of judicial intervention. Those costs will be prohibitive, and then the court will refuse to fill the gap, as in the common law's refusal to enforce a contract that lacks a price or quantity term. The alternative of interpolating a "reasonable price" or "reasonable quantity" clause is rejected because a court would find it too burdensome to figure out what price or quantity the parties would have chosen had they negotiated the term. Not only would the court incur the administrative cost of having to conduct an elaborate inquiry, but no matter how elaborate the inquiry, a substantial probability of error would remain, and an erroneous interpretation undermines the utility of contracting as a method of organizing economic activity.
>
> Nor would the cost savings be significant. Normally it is only through inadvertence that the parties will have failed to negotiate price or quantity, and in those cases judicial interpolation of the missing term would not reduce overall contractual transaction costs. On the contrary, it would increase them. The costs of judicial gap filling in such a case would exceed the costs to the parties of filling the gap at the contract-negotiation stage; that is implied by the parties' having inadvertently omitted them. Also, the absence of such a term is often compelling evidence that the parties' negotiations had not reached the stage of actual agreement. In that event, judicial interpolation of terms would amount to the court making a contract for the parties rather than enforcing something that could properly be regarded as the deal they had struck.

83 Tex. L. Rev. 1581, 1587–8 (internal citations omitted). The fact that there were so many significant terms unaddressed in the Letter of Intent is a clear indication that the parties had not reached agreement.

{32} The Court's conclusion that the Letter of Intent was non-binding is further supported by the nature of the transaction. The completion of a real estate development project, and its ongoing management in a joint venture, generally require the execution of lengthy, sophisticated, and detailed documents to govern the relationships between the parties.

{33} In addition, there is clear evidence that JDH understood that Flowers did not consider the Letter of Intent to be binding and JDH failed to take a contrary position at the time those statements were made. *See supra* ¶ 25.

{34} Furthermore, JDH drafted the Letter of Intent and is responsible for the non-binding language. Any ambiguity, therefore, should be resolved against JDH. *See Reichold Chem., Inc. v. Goel*, 146 N.C. App. 137,153, 555 S.E.2d 281, 291 (2001); *see also Washburn v. Yadkin Valley Bank & Trust Co.*, ___ N.C. App. ___, ___, 660 S.E.2d 577, 583 (2008).

{35} Moreover, JDH was responsible in large part for the delay in preparing a detailed final agreement. The Court notes that the binding agreement was to be prepared within thirty (30) days of the date of the Letter of Intent. Had that been done, many of the problems would have been avoided. It was within JDH's control to see that the binding agreement was signed before the project progressed too far.

{36} JDH was thus responsible for both the ambiguity in the original Letter of Intent and the delay in drafting the formal documentation. JDH created the uncertainty. It is not unusual for courts to use contract interpretation rules to punish the party responsible for creating contracting uncertainty. *See* Posner, *supra*, at 1592.

{37} Significantly, the Letter of Intent failed to provide a remedy in the event the joint venture was never formed. As a sophisticated developer, JDH could have provided for a remedy in the Letter of Intent. The absence of any remedy is the best indication that this was simply a non-binding agreement by which the parties

explored the possibility of a joint venture without any obligation to go forward and without any penalty for failing to complete a final agreement.

{38}    In this respect, the Letter of Intent differs significantly from the agreement at issue in *Crockett*.  In *Crockett*, the Court was not required to supply any material terms in order to enforce the agreement.  The agreement was complete in the sense that it provided a contractual remedy in the event there was no agreement reached in connection with a proposed joint venture.  Here, the Court would have to speculate as to the final design of the development, the projected budget, and the success of the development in order to determine damages from an unexecuted agreement.  The collapse of the real estate and credit markets in the fall of 2008 demonstrate the unreliability inherent in making the last determination. The *Crockett* case is closer to the decision in *Sony Ericsson Mobile Commc'ns USA, Inc. v. Agere Sys., Inc.*, 2007 NCBC 28 (N.C. Super. Ct. Aug. 27, 2007), http://www.ncbusinesscourt.net/opinions/2007%20NCBC%2028.pdf, *aff'd*, No. COA 08-525 (N.C. Ct. App. Mar. 3, 2009), where the Court found that it did not have to supply any additional terms in order to enforce the agreement.

{39}    Finally, the conduct of the parties after execution of the Letter of Intent is also indicative of its non-binding nature.  The parties continued to negotiate important issues, such as budget and architectural design and layout. Furthermore, no credit line was put in place for financing a completed transaction. Flowers did not hide her belief that there was no binding agreement in place and made her views known directly to JDH.

{40}    JDH had at least three (3) means of protecting itself.  First, JDH could have seen that the definitive agreement was executed within thirty (30) days as it originally proposed.  Second, it could have provided a remedy in the event an agreement could not be reached.  Finally, it could have insisted on binding language in the Letter of Intent.

{41}    In summary, the conduct of the parties both before and after execution of the Letter of Intent, the language of the document itself, and the necessity for the Court to supply material terms, all support the conclusion that the Letter of Intent

was a non-binding agreement to agree, which is unenforceable.  The non-binding language in the agreement, drafted by Plaintiff, is the most compelling factor.

B.

ORAL AGREEMENT AND PARTIAL PERFORMANCE

{42}  The second question raised by the pending motions is whether this unenforceable Letter of Intent may be converted into an enforceable agreement by an oral agreement or partial performance.  Plaintiff has moved to amend the complaint to allege an oral agreement and has argued that the Letter of Intent became enforceable by virtue of partial performance by the parties.

{43}  Each theory requires the Court to ignore the plain language of the Letter of Intent, which calls for the execution of a detailed final agreement of the type generally associated with similar real estate development projects.  Plaintiff argues that as the negotiations progressed, more and more issues were resolved until all the material terms had been settled, thus creating a binding contract by partial performance or oral agreement.

{44}   For the same reasons our courts have declined to enforce agreements to agree, the Court is not persuaded that either theory is applicable here.  Where the parties have failed to reach an agreement from which the courts can glean the material terms, courts should not be in the business of creating contracts for the parties. *See* Posner, *supra*, at 1587–8; s*ee also Boyce*, 285 N.C. at 734, 208 S.E.2d at 695; *Knight v. Sharif,* 875 F.2d 516, 524 (5th Cir. 1989) (noting "the potential tyranny of courts in forcing contracts upon parties which they were not willing to make for themselves").   Nor should the courts ignore an initial agreement between the parties that fails to include binding language and specifically states that the agreement is non-binding until a definitive agreement is reached.  That is particularly true where the business arrangement being negotiated is one in which a comprehensive agreement is both normal and advisable. *See Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc.*, 145 F.3d 543, 549 (2nd Cir. 1998).  Based on the record before the Court, there is no evidence that either party waived the execution of

binding agreements governing the operation of the LLC. The evidence is to the contrary.

{45}   Here, the final architectural plan had not been agreed upon, and it affected the budget. The budget, therefore, was not finalized. Nor had the financing been put in place, which would have been a significant part of completing the deal.

{46}   One fundamentally fair way of assessing Plaintiff's argument is to determine whether there was an agreement that could be enforced against Plaintiff if it had declined to execute the final agreement. The Court could not force Plaintiff to complete the joint venture without creating terms for the contract that Plaintiff never agreed to. Plaintiff had responsibility for arranging the financing of the development. What financing terms would the Court have imposed on Plaintiff? How would the Court have determined damages if Plaintiff had not gone forward with the development? What architectural plan and budget would the Court have used? What terms would the Court have included in the LLC agreement? What deadlines for completion would the Court have used? What lease terms for space other than the anchor tenant would the Court have used? How could the Court have ordered specific performance as to JDH? Ultimately, JDH should not be in a position to enforce a contract which could not be enforced against it.

{47}   For the foregoing reasons, JDH has failed to establish an oral contract or a contract based upon partial performance. Amendment of the Complaint would therefore be futile. *See Carter v. Rockingham Cty. Bd. of Educ.*, 158 N.C. App. 687, 690, 582 S.E.2d 69, 72 (2003); *see also Rosenthal v. Perkins*, 42 N.C. App. 449, 455, 257 S.E.2d 63, 67 (1979). The Motion for Leave to Amend the Complaint is therefore **DENIED.**

## C.

## QUANTUM MERUIT

{48}   The Court now turns to Plaintiff's claim for *quantum meruit.* This cause of action fails for a number of reasons. Most importantly, Plaintiff has failed to establish an expectation that it would be paid for any service. To award damages for *quantum meruit* under these circumstances would create enormous uncertainty

in real estate development law and lead to needless litigation in the future.  In addition, Plaintiff's original damage claim for the entire value of a fully developed and leased commercial tract is unsupported by law.  Plaintiff's more narrow damage claims for specific services fail because Flowers has yet to receive a benefit from the purported services, and any future benefit is speculative and uncertain.  Some of the services urged to support the *quantum meruit* claim were actually ideas given to Flowers in order to demonstrate JDH's expertise and thus encourage her participation in the joint venture.  Furthermore, the ideas were given to Flowers prior to the parties' entry into the Letter of Intent.

{49}   Parties enter into letters of intent because they have unresolved issues.  They understand that there are risks involved because of the clear possibility that no final agreement may be reached.  JDH is a sophisticated developer.  It drafted the Letter of Intent.  It knew that there were risks involved.  It knew that Flowers had reservations and specific desires with respect to her property.  At no time did JDH indicate to Flowers that she would be expected to pay for any service it provided if a final agreement was not reached.  It could have contracted for that protection.  Moreover, there is no evidence in this record that Flowers believed she would have to compensate JDH if a final agreement was not reached.  JDH was free at any point to decline performance of any service unless it received an agreement to be paid.  JDH could have eliminated the risks, but it chose not to do so.

{50}   Absent some evidence of expectation of payment, there can be no claim for *quantum meruit*.  Otherwise, parties would be unable to enter into letters of intent because they would never know what liabilities they might incur if a final deal was not reached.  The rationale for rejecting *quantum meruit* under circumstances such as these is clearly stated in *Paramount Brokers, Inc. v. Digital River, Inc.*, 126 F. Supp. 2d 939 (D. Md. 2000):

> [A] plaintiff may recover under the theory of *quantum meruit* only if it had a reasonable expectation of being paid.  A broker may recover under a theory of *quantum meruit* if his efforts have been contributed under circumstances from which an expectation of payment may be inferred.

On the record here, this Court concludes that plaintiff's *quantum meruit* claim must fail. It cannot be inferred on this record that plaintiff had a reasonable expectation of being paid for services rendered during the period of time when the parties were attempting to negotiate a finalized broker agreement. As a broker which had engaged in prior negotiations of the sort involved in this case, plaintiff knew from the outset that if no final agreement was ever reached by the parties, lost time and effort would result. Parties seeking to conclude a business deal like this one obviously assume risks of this sort.

*Paramount*, 126 F. Supp. 2d at 949 (internal citations omitted).

{51}   Plaintiff has asserted two (2) different measures of damages under the *quantum meruit* claim. Both have defects. North Carolina law is clear that a plaintiff in a *quantum meruit* case is only entitled to recover the *reasonable value* of services or goods *accepted and appropriated* by a defendant. *See MacEachern v. Rockwell Int'l Corp.*, 41 N.C. App. 73, 76, 254 S.E.2d 263, 266 (1979); *see also Forbes v. Pillmon*, 22 N.C. App. 69, 70, 205 S.E.2d 600, 601 (1974); *Stout v. Smith*, 4 N.C. App. 81, 84, 165 S.E.2d 789, 792 (1969).

{52}   Plaintiff's first approach to damages was to claim, in essence, the amount of profit it would have received from the joint development if the project had been completed. Under this approach, Plaintiff would be rewarded for services it never actually provided. JDH never arranged financing, guaranteed any debt, supervised the building of any structure, leased any space, or managed any development. Thus, its claim to lost profits is not the proper measure of damages for the reasonable value of services rendered.

{53}   Plaintiff's alternative approach to damages was to claim that it provided specific services for which Flowers was obligated to pay. The two main services for which compensation is sought are design and layout recommendations and solicitation of Lowe's Foods as the anchor tenant. The development has not been built, so there has been no appropriation of this service by Flowers. JDH provided Flowers with ideas about the development prior to signing the Letter of Intent. It did so voluntarily and without expectation of payment. Given the total collapse of

the real estate market, neither the Court nor a jury should speculate that the development will be built and that it will be built according to the plans in existence when Flowers pulled out of the Letter of Intent. Likewise, no lease was entered into with Lowe's Foods as a tenant. The only evidence is that Flowers did approach Lowe's Foods after termination of her relationship with JDH and that Lowe's Foods was prepared to enter into negotiations with her. Had JDH procured an actual lease, pursuant to which Lowe's Foods actually occupied space and paid rent, a different outcome may have resulted. In that case, JDH would have provided a service for which the reasonable value could be determined, and that service would have been accepted and appropriated or used by Flowers. However, that never occurred.[2] JDH's first and second measures of damage are not supported by our law.

D.

TORT CLAIMS

{54} Finally, the Court turns to Plaintiff's negligent misrepresentation, fraud, and unfair trade practice claims. Defendants are entitled to summary judgment on these claims as well.

{55} JDH sought out Flowers. Flowers did not go looking for JDH. Flowers already planned to develop her property and expressed reluctance to get involved with JDH. She explained at the outset that she wanted architectural control over the property, which would affect her adjacent residential real estate development. JDH knew there were budgeting, financing, and leasing issues to be negotiated at the time it entered into the Letter of Intent. Furthermore, JDH inserted the language regarding the necessity of a final written LLC agreement in the Letter of Intent. After the Letter of Intent was signed, JDH knew there were still material

---

[2] The Court notes for the record that there was evidence from Plaintiff that prior to entering into the Letter of Intent, Plaintiff had already told Flowers about defects in her design and layout and made specific recommendations for changes. Plaintiff also explained to Flowers that she was looking for the wrong anchor grocery store and that there were only three she should be considering, including Lowe's Foods. The Court also notes that Flowers paid her own draftsman to actually create the layouts for the buildings for the development. JDH may not recover for ideas it gave Flowers in order to impress her with its expertise.

issues to be resolved.  JDH, not Flowers, was responsible for the delay in getting the document prepared.  Flowers did not delay the process.  In fact, she voiced her concerns over the delays.  Other than the failure to reach a final agreement, there is no evidence that Flowers made any untrue representation to JDH or made any promise which she did not intend to keep.  *See Williams v. Williams*, 220 N.C. 806, 810, 18 S.E.2d 364, 366 (1942) (stating that mere unfulfilled promises cannot be the basis for a cause of action for fraud unless the promissor had no intention of carrying out the promise at the time it was made and that proof of non-performance is not sufficient to establish the necessary fraudulent intent).  There is no evidence that Flowers hid anything from JDH.  There is ample evidence that she voiced her concerns before and after the Letter of Intent was signed.  JDH, by its own testimony, portrayed her as naïve when it came to real estate development.  (Hill Dep. (Vol. I) 77:3–78:7 Dec. 19, 2007.)  As previously noted, sophisticated businesses like JDH know that there are risks associated with letters of intent and willingly assume those risks when entering into such agreements.  Therefore, JDH could not establish reasonable reliance on Flower's oral statements.

V.

CONCLUSION

{56}  Based on the foregoing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED**:

1. Defendant's Motion for Summary Judgment is **GRANTED**;

2. Plaintiff's Motion for Leave to Amend the Complaint is **DENIED**; and

3. Plaintiff's claims are dismissed with prejudice.

**SO ORDERED**, this 13th day of March, 2009.