Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc., 2009 NCBC 5.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 08 CVS 000691 |

CROCKETT CAPITAL CORPORATION,

      Plaintiff,

v.

INLAND AMERICAN WINSTON HOTELS,
INC. and WINN LIMITED PARTNERSHIP,

      Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
DISMISS AMENDED COMPLAINT**

{1}    This matter is before the Court on Defendants' Motion to Dismiss the Amended Complaint, filed March 26, 2008. Upon review of submissions by counsel, and after hearing oral argument, the Court hereby **DENIES** Defendants' Motion to Dismiss.

    *Robinson, Bradshaw & Hinson, P.A. by John R. Wester, Louis A. Bledsoe, III, and Jennifer F. Revelle for Plaintiff.*

    *Moore & Van Allen PLLC by Scott M. Tyler and Karin M. McGinnis, and DLA Piper US LLP by Jeffrey D. Herschman and Megan Hanley Baer for Defendants.*

Tennille, Judge.

I.

PROCEDURAL BACKGROUND

{2}    This action was filed in Wake County Superior Court on January 16, 2008. Plaintiff Crockett Capital Corporation filed the Notice of Designation simultaneously with the Complaint on January 16, 2008. This action was designated a mandatory complex business case by Order of the Chief Justice on

January 17, 2008, and subsequently assigned to the undersigned Chief Special Superior Court Judge for Complex Business Cases. Plaintiff filed the Amended Complaint on March 6, 2008.

{3} Defendants filed a Motion to Dismiss for failure to state a claim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure on March 26, 2008. The Court heard oral argument on June 13, 2008.[1]

II.

FACTUAL ALLEGATIONS

A.

THE PARTIES

{4} Plaintiff Crockett Capital Corporation ("Plaintiff" or "Crockett") is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. Plaintiff is engaged in the business of developing and managing hotel properties.

{5} Defendant Inland American Winston Hotels, Inc. ("Inland") is a Delaware corporation with its principal place of business in Raleigh, North Carolina.

{6} Defendant WINN Limited Partnership ("WINN") is a North Carolina limited partnership with its principal place of business in Raleigh, North Carolina. Defendant Inland is the general partner of WINN.

{7} Inland and WINN are engaged in the business of owning and operating hotels and other hospitality properties.

{8} On July 1, 2007, Inland acquired all of Winston Hotels, Inc.'s ("Winston Hotels") capital stock. At that time, Winston Hotels was a North Carolina corporation and the general partner of WINN. Plaintiff's current key executives were key executives with Winston Hotels before the acquisition.

{9} Inland and WINN will be referred to collectively as the "Defendants."

---

[1] The case of *JDH Capital LLC v. Flowers,* 2009 NCBC 4 (N.C. Super. Ct. Mar. 13, 2009) (hereinafter "*JDH*"), decided contemporaneously with this case, also discusses enforceability of agreements to agree in a real estate development context but was decided at the summary judgment stage.

B.

THE MASTER AGREEMENT

{10}   As a result of Inland's acquisition of Winston Hotel's capital stock (Am. Compl. ¶ 6; Am. Compl., Ex. A, at A), Defendants acquired ownership of hotel properties currently under construction and "other properties that may be suitable for development as hotel projects." (Am. Compl., Ex. A, at A.)  Thereafter, Defendants engaged Plaintiff, who "has expertise in the development, construction and management of hotel properties," to provide construction management for the hotel properties under construction and development packages for the properties suitable for development as hotels.  (Am. Compl., Ex. A., at B.)

{11}   The principals in Crockett previously managed Winston Hotels, and they were, therefore, familiar with the properties that Winston Hotels previously targeted for potential development.  Crockett had the development expertise, and Defendants had access to capital to fund development.

{12}   In late July 2007, Plaintiff and Defendants entered into an agreement entitled "Agreement Regarding Development Projects" (the "Master Agreement"), [2] in which they sought to combine their strengths.  (Am. Compl. ¶ 8; Am. Compl., Ex. A.)  The Master Agreement was made effective retroactively to July 1, 2007. (Am. Compl. ¶ 9; Am. Compl., Ex. A.)  Exhibit B to the Master Agreement identified thirteen (13) properties for potential development (the "Pipeline Properties").  (Am. Compl. ¶ 11; Am. Compl., Ex. A, at Ex. B.)  The proposed Pipeline Properties included Westin, Hilton Garden Inn, Hampton Inn, and Aloft hotel franchise properties.  (Am. Compl. ¶ 11; Am. Compl., Ex. A, at Ex. B.)   The Master Agreement outlined the potential ownership and development of the thirteen (13) Pipeline Properties.  (Am. Compl. ¶ 8; Am. Compl., Ex. A, at C.)

---

[2] Kenneth Crockett and Robert Winston formed Crockett Capital Corporation on July 11, 2007.  (Defs.' Mot. Dismiss Am. Compl. 4 n.2.)  Kenneth Crockett was formerly the Executive Vice President and Chief Development Officer of Winston Hotels.  (Defs.' Mot. Dismiss Am. Compl. 4 n.2.)  Mr. Crockett signed the Master Agreement on behalf of Crockett Capital Corporation.  (Defs.' Mot. Dismiss Am. Compl. 4 n.2.)  Brent West, Chief Financial Officer of Inland, signed the Master Agreement on behalf of Inland.  (Defs.' Mot. Dismiss Am. Compl. 4 n.2.)  After Mr. West signed the Master Agreement, he resigned as Inland's Chief Financial Officer and began working for Crockett Capital Corporation.  (Defs.' Mot. Dismiss Am. Compl. 4 n.2.)

{13} Pursuant to paragraph 2 of the Master Agreement, Plaintiff agreed to evaluate the Pipeline Properties and submit to Defendants preliminary development packages. (Am. Compl. ¶ 11; Am. Compl., Ex. A. ¶ 2.) The preliminary development packages were to include, among other things, a "single page investment description," "proposed franchisors," a "preliminary cost budget," "projected net operating income," "preliminary proposed equity percentages" ranging from five (5) to twenty (20) percent for Crockett, and "projected leverage returns to equity." (Am. Compl., Ex. A. ¶ 2.) Upon receipt of a preliminary development package, Defendants had ten (10) days to provide written notice to Plaintiff of their decision to pursue development of a Pipeline Property. (Am. Compl. ¶ 12; Am. Compl., Ex. A. ¶ 2.) If Defendants chose to pursue development, Plaintiff would produce "a second, more detailed pre-development package." (Am. Compl., Ex. A. ¶ 2.) Again, Defendants were required to provide written notice within ten (10) days if they wished to continue development of the property. (Am. Compl., Ex. A. ¶ 2.) Upon submission of the second development package, if Defendants elected to proceed, Plaintiff would create a detailed third and final development package with a lump sum cost estimate. (Am. Compl., Ex. A. ¶ 2.) Defendants' failure to give written notice at the required stages would constitute a rejection of the opportunity to develop the Pipeline Property with Plaintiff. (Am. Compl. ¶ 13.)

{14} Upon submission of a final development package, if Defendants elected to continue development, the Master Agreement required Plaintiff and Defendants to form a limited liability company to operate the property as a joint venture (a "Joint Venture"). (Am. Compl. ¶ 14; Am. Compl., Ex. A ¶ 3.) Each Joint Venture was to be governed by an operating agreement that was in "substantially" the same form as the operating agreement attached to the Master Agreement as Exhibit E. (Am. Compl. ¶ 14; Am. Compl., Ex A. ¶ 3.) Exhibit E is a detailed limited liability company agreement. (Am. Compl., Ex. A., at Ex. E). Exhibit E, however, leaves open the name of the limited liability company, the date of creation, the location of the Joint Venture's principal office, and the capital contributions to be made by

Plaintiff and Defendants. (Am. Compl., Ex. A., at Ex. E.) Those items would have been set forth in the development package agreed to by the parties.

{15} In the event Defendants chose not to develop a Pipeline Property with Plaintiff, the Master Agreement gave Plaintiff the right to develop such Pipeline Property on its own or with another third party. (Am. Compl. ¶ 22; Am. Compl., Ex. A. ¶ 5.) Specifically, upon Defendants' rejection of a development package, Defendants "agree[d] to transfer, convey and assign, any rights [they] ha[ve] in any such Pipeline Property to [Plaintiff] or its assignee, and to execute all documentation reasonably necessary to accomplish such transfer, upon payment by [Plaintiff] to [Defendants their] acquisition costs incurred to date for such rights." (Am. Compl. ¶ 23; Am. Compl., Ex. A. ¶ 5.) Defendants were further protected by contract provisions that granted Defendants another chance to accept a previously rejected development package if Plaintiff later made "material changes" to the development package. (Am. Compl., Ex. A. ¶ 5.) Crockett was bound to notify Inland of any material change in the terms of a Pipeline Project previously rejected by Inland. Paragraph 5 of the Master Agreement specifically provided:

> In the event of a material change in the terms of a Pipeline Project previously rejected by Inland, [Crockett]'s right to develop such Pipeline Project is subject to a further determination by Inland not to develop such Pipeline Project after review of an updated pre-development package submitted by [Crockett] and reflecting such revised terms. For purposes hereof, a "material change" in the terms of a Pipeline Project shall mean (i) a change in the hotel brand; (ii) a change of more than 10% in the number of rooms; (iii) a decrease of more than 7.5% of the total development cost estimate; or (iv) an increase of more than 7.5% in the Net Operating Income projected over the first three years of hotel operation.

(Am. Compl. ¶ 23; Am. Compl., Ex. A. ¶ 5.) The Court will refer to the provisions governing rejection of a Pipeline Property by Defendants as the "impasse" provisions.

{16} In order to comply with Internal Revenue Code Regulations with respect to real estate investment trusts ("REITs"), Paragraph 3 of the Master Agreement

further required each Joint Venture to "lease the Pipeline Property to an operating entity." (Am. Compl. ¶ 15; Am. Compl., Ex. A. ¶ 3.) The leases were to be "'substantially similar' to the leases used by WINN . . . in other projects for purposes of compliance with REIT regulations." (Am. Compl. ¶ 15; Am. Compl., Ex. A. ¶ 3.) An example or form lease, however, was not included with the Master Agreement. Paragraph 3 of the Master Agreement sets a "5-year [lease] term[] with automatic renewals" at the current market rental rate, but it does not set a specific base rent. (Am. Compl., Ex. A. ¶ 3.) Instead, Paragraph 3 provides a formula for determining the base rent which includes "property taxes, casualty insurance premiums, and a reasonable capital reserve." (Am. Compl., Ex. A. ¶ 3.) The parties were to have the same ownership interest in each lease as they had in the corresponding Joint Venture. (Am. Compl. ¶ 16.)

{17}   In Paragraph 4 of the Master Agreement, the parties agreed that Plaintiff would provide construction management and hotel management for each Joint Venture. (Am. Compl. ¶ 17; Am. Compl., Ex. A. ¶ 4.) With respect to hotel management, the parties agreed to execute an agreement "in substantially the form" of Exhibit D to the Master Agreement. (Am. Compl. ¶ 18; Am. Compl., Ex. A. ¶ 4(b).) Exhibit D is a detailed form hotel management agreement. (Am. Compl., Ex. A., at Ex. D.) Similarly, with respect to construction management, the parties agreed to enter into an agreement "in substantially the form" of Exhibit F to the Master Agreement. (Am. Compl. ¶ 19; Am. Compl., Ex. A. ¶ 4(a).) Exhibit F is a comprehensive form development agreement. (Am. Compl., Ex. A., at Ex. F.) Paragraph 4 of the Master Agreement also provided that Defendants had the right to manage any office or retail portion of any Pipeline Property and to be "compensated for such management services at a market rate to be determined in accordance with the [Joint Venture] operating agreement." (Am. Compl., Ex. A. ¶ 4.) The Court will refer to the various form agreements attached to the Master Agreement as the "implementing" agreements.

{18}   Enforcement of the impasse provisions is separate and distinct from enforcement of a Joint Venture Agreement with existing gaps.

{19} The Master Agreement, together with the extensive attachments, constituted a very sophisticated business transaction among parties of equal knowledge negotiating at arms length. As this Court noted in *JDH*, real estate development requires sophisticated documentation. *JDH*, 2009 NCBC 4 ¶ 18. The extensive nature of the documentation left very few items to be negotiated for each site. The parties used formulas to set certain items, such as the rent under any lease agreement. (*See* Am. Compl., Ex. A. ¶ 3.) In essence, the parties established working agreements to cover each aspect of a joint development once the decision was made to move forward with that property. One key decision to be made with respect to each Pipeline Property was the division of capital contribution to be made by each party. That decision dictated ownership in each Joint Venture. Each project would have its own capital structure to be negotiated among the parties.

{20} The Master Agreement contained no language indicating that it was merely a letter of intent. These sophisticated parties elected not to use such language.

C.

THE PARTIES' DEALINGS

{21} On or about July 12, 2007, Plaintiff presented a preliminary development package to Defendants for an Aloft Hotel in Chapel Hill, North Carolina (the "Chapel Hill Aloft"). (Am. Compl. ¶ 28.) The Chapel Hill Aloft was one of the Pipeline Properties. (Am. Compl. ¶ 28; Am. Compl., Ex. A., at Ex. B.) On July 25, 2007, Defendants provided written notice of their desire to proceed with development of the Chapel Hill Aloft. (Am. Compl. ¶ 29.) On or about September 28, 2007, in accordance with the Master Agreement, Plaintiff presented Defendants with a second development package for the Chapel Hill Aloft. (Am. Compl. ¶ 30.) After submission of the second development package, however, Defendants did not provide notice that they wished to proceed further with development of the Chapel Hill Aloft. (Am. Compl. ¶ 31.) Plaintiff attempted to enforce Paragraph 5 of the Master Agreement, but Defendants "refused to transfer, convey and assign their rights" in the Chapel Hill Aloft to Plaintiff. (Am. Compl. ¶ 35).

{22}     Similarly, Plaintiff submitted preliminary development packages for six (6) other Pipeline Properties, including, among others, a Westin Hotel in Durham, North Carolina (the "Durham Westin") and a Hampton Inn & Suites/Aloft Hotel in Raleigh, North Carolina (the "Raleigh Hampton/Aloft"). (Am. Compl. ¶ 32.) After receipt of the preliminary development packages, Defendants failed to provide written notice that they wished to proceed with development of the Durham Westin or the Raleigh Hampton/Aloft. (Am. Compl. ¶ 33.) Subsequently, Plaintiff attempted to enforce Paragraph 5 of the Master Agreement, but Defendants "refused to transfer, convey and assign their rights" in the Durham Westin or the Raleigh Hampton/Aloft to Plaintiff. (Am. Compl. ¶ 35.)

{23}     Plaintiff submitted preliminary development packages for two other Pipeline Properties: an Aloft Hotel in Cary, North Carolina (the "Cary Aloft"), and an Aloft Hotel in Birmingham, Alabama (the "Birmingham Aloft"). (Am. Compl. ¶ 36.) Defendants elected to develop both properties, and the parties agreed that Defendants would own a ninety-five (95) percent equity interest and Plaintiff would own a five (5) percent equity interest in both properties. (Am. Compl. ¶¶ 37–38.) In regard to the Birmingham Aloft, Plaintiff and Defendants executed all the documents as required by the Master Agreement. (Am. Compl. ¶ 39–41.) The parties used the Birmingham Aloft documents as a model for the Cary Aloft documents. (Am. Compl. ¶ 39.) At Defendants' request, outside counsel prepared Joint Venture documentation for the Cary Aloft, and such documentation was approved by Defendants. (Am. Compl. ¶ 42–43.) However, Defendants subsequently "began to frustrate and delay the process of making final the Joint Venture documentation required by the Master Agreement." (Am. Compl. ¶ 44.) Defendants "have refused to form a Joint Venture to own the [Cary] Aloft" and "have refused to enter into a [l]imited [l]iability [c]ompany [a]greement substantially similar to Exhibit E to the Master Agreement." (Am. Compl. ¶ 46.) Furthermore, Defendants "refused to permit [Plaintiff] to provide hotel property management services for the [Cary] Aloft" and have otherwise failed to cooperate. (Am. Compl. ¶ 46.)

# III

## MOTION TO DISMISS

{24}   Defendants have moved to dismiss Plaintiff's Amended Complaint for failure to state a claim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule 12(b)(6)").  (Def's Mot. Dismiss 1.)  In its Amended Complaint, Plaintiff sought (1) damages for breach of the Master Agreement with respect to the Cary Aloft, (2) specific performance of Defendants' obligation under paragraph 5 of the Master Agreement to transfer, convey, and assign their rights in the Chapel Hill Aloft, Durham Westin, and Raleigh Hampton/Aloft to Plaintiff, or, in the alternative, (3) damages for breach of the Master Agreement with respect to the Chapel Hill Aloft, Durham Westin, and Raleigh Hampton/Aloft.

{25}   The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the pleading against which the motion is directed.  *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970).  In *Branch Banking & Trust Co. v. Lighthouse Fin. Corp.*, 2005 NCBC 3 (N.C. Super. Ct. July 13, 2005), http://www.ncbusinesscourt.net/opinions/2005%20NCBC%203.htm, this Court summarized the Rule 12(b)(6) standard as follows:

> When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted."  In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true.  The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.  When considering a motion under Rule 12(b)(6), the court is not required to accept as true any conclusions of law or unwarranted deductions of fact in the complaint.  When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts which defeat any claim, the complaint should be dismissed under Rule 12(b)(6).

*Branch Banking & Trust Co.*, 2005 NCBC 3 ¶ 8 (*quoting Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)) (citations omitted).

{26}  Furthermore, the Court may not consider "extraneous matter" outside the complaint, or else the Rule 12(b)(6) motion will be converted into a Rule 56 motion for summary judgment. *See, e.g.*, *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890–91 (1979).  However, the Court may consider documents the moving party attaches to a 12(b)(6) motion that are the subject of the challenged pleading and specifically referred to in that pleading, even though they are presented to the Court by the moving party. *See Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001) (considering a contract on a 12(b)(6) motion even though the contract was presented by the movant).  The Court is not required to accept as true "any conclusions of law or unwarranted deductions of fact." *Id.* at 56, 554 S.E.2d at 844.  Thus the Court can reject allegations that are contradicted by the supplementary documents presented to it. *See E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (stating that the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments").

## IV.
### ANALYSIS

{27}  This Order and Opinion **DENIES** Defendants' Motion to Dismiss for failure to state a claim.  That is all it does. This is not a summary judgment decision.  This Order simply holds that on its face, without exploration by discovery, there is an interpretation of the Master Agreement that would create a binding contract to transfer certain Pipeline Properties as opposed to an unenforceable agreement to agree or letter of intent.

{28}  Our Courts have repeatedly stated a reluctance to enforce contracts that require the Court to supply material terms not specified in the parties' agreement. *See Chappell v. Roth*, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001) (finding that a document that merely expresses the intent and desires of the parties, rather than their agreement, and which leaves no means to settle the unresolved terms, is not enforceable as a contract); *Housing, Inc. v. Weaver*, 305 N.C. 428, 444, 290 S.E.2d

642, 652 (1982 ) (finding that a document, which failed to specify the form of ownership of the subject project, was not enforceable); *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) ("'If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.'" (quoting *Croom v. Goldsboro Lumber Co.*, 182 N.C. 217, 220, 108 S.E. 735, 737 (1921))); *N.C. Nat'l Bank v. Wallens*, 26 N.C. App. 580, 584, 217 S.E.2d 12, 15 (1975) ("Generally, a contract, or an offer to contract, which leaves material portions open for future negotiations is nugatory and void for indefiniteness." (citing *Boyce v. McMahan*, 22 N.C. App. 254, 206 S.E.2d 496, *aff'd* 285 N.C. 730, 208 S.E.2d 692 (1974))).

{29} In *JDH*, this Court declined to find an enforceable agreement. *See JDH*, 2009 NCBC 4. At the summary judgment stage, the Court could determine whether the relief sought could be obtained without the Court having to supply material terms. In doing so, the Court looked first and foremost to the language of the documents at issue. It also considered the sophistication of the parties, their relationship and prior dealings, the nature of the business that was the subject of the agreement, the drafting process, and the pre-execution and post-execution conduct of the parties. Finally, the Court considered whether the agreement was mutually enforceable. *See JDH*, 2009 NCBC 4 ¶ 46.

{30} As a legal standard, the Court reiterated its holding in *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consolidated,* 2003 NCBC 3 (N.C. Super. Ct. April 28, 2003), which relied on the appellate decision in *Boyce v. McMahan*, 285 N.C. 730, 735, 208 S.E.2d 692, 695 (1974). For a thorough discussion of contract interpretation, see Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 Tex. L. Rev. 1581 (2005).

{31} The parties in this action have taken two divergent views concerning the Court's interpretation and enforcement of their agreements. (*Compare* Defs.' Br. Supp. Mot. Dismiss *with* Pl.'s Br. Opp'n. Mot. Dismiss.) Defendants, relying on *Durham Coca-Cola*, point to the fact that the agreements between the parties require that the Court supply key material terms in order to enforce the agreement.

(*See* Defs.' Br. Supp. Mot. Dismiss 7–14.) Specifically, Defendants point to the absence of any agreement with respect to capital contributions for any Pipeline Property. (*See* Am. Compl., Ex. A, at Ex. E, Article IX.) Defendants assert that absent agreement of the parties, the Court is in no position to fill in that critical figure, even though it is limited to a specific range. (*See* Am. Compl., Ex. A. ¶ 2.) Defendants also rely on other provisions in the implementing agreements which have not been fully agreed upon and which may be material. Defendants note, "[a]lthough the parties attempted to provide overarching guidance through template agreements, these templates left open issues such as ownership percentage, rent, and compensation." (Defs.' Br. Supp. Mot. Dismiss 10.)

{32} At the heart of Defendants' argument is the premise that the Court could not force the parties to complete any Pipeline Project because it would have to set material terms, such as capital contribution percentages, in order to do so. In Defendants' view, the highly sophisticated agreements developed by the parties are mutually unenforceable. Defendants may be correct in their assessment of documents necessary to form a Joint Venture. However, it is not clear that because the implementing agreements for the ultimate development of a Pipeline Property are unenforceable, the Plaintiff is not entitled to the relief it seeks in the Complaint.

{33} The impasse provisions in Paragraph 5 of the Master Agreement do not require the Court to supply any material terms. Inland is protected by (a) reimbursement for its costs of acquisition and (b) a second chance to reconsider participation if material terms of the proposed project change. (Am. Compl., Ex. A. ¶ 5.) One interpretation of the agreement would prevent Crockett from simply acquiring Inland's options and selling them. Crockett may be required to develop a Pipeline Project on terms rejected by Inland or else forego the opportunity. In today's credit crunch and real estate downturn, that could be a significant restriction. The Court finds that the impasse provisions are complete and do not require supplementation by the Court. The provisions grant Crockett the right to develop a Pipeline Property on the same terms offered to Inland.

{34} Unlike the *JDH* case, in which the Court is asked to supply terms missing from a written letter of intent, this case involves the enforcement of specific remedies provided for in the agreement itself. The impasse provisions apply when the parties are unable to agree on the narrow range of issues left open with respect to each Pipeline Property. The letter of intent in the *JDH* case contained no impasse provisions. *See JDH*, 2009 NCBC 4. Absent the impasse provisions in this agreement, the lack of agreement on such key terms as capital contribution would pose a significant barrier to judicial enforcement.

{35} The Master Agreement recognized that Inland might choose not to participate in a Joint Venture for a particular Pipeline Property. That choice was a recognized component of the contract. Inland could have contracted to keep its options on the Pipeline Project and reimburse Crockett for its development costs. It did just the opposite. Inland protected itself by providing for receipt of not only any acquisition costs of the option on the Pipeline Property, but also as any project development costs it had incurred.

{36} Inland was also protected against Crockett's changing the development plan for the project in a material way without Inland having the opportunity to revisit its decision not to participate. These were sophisticated parties drafting sophisticated documents. They did not use language indicating the absence of material agreements in the Master Agreement.

{37} This case is similar to the recent case decided by the North Carolina Court of Appeals in *Sony Ericcson Mobile Commc'n USA, Inc. v. Agere Sys., Inc.*, No. COA 08-525 (N.C. Ct. App. March 3, 2009). That case centered on the enforceability of a forum selection provision in a Master Agreement (the "MDLA") which contemplated that the parties would enter into future agreements to be governed by a Statement of Work (the "SOW"). In affirming the trial court's enforcement of the forum selection clause in the MDLA, the Court of Appeals stated:

> The MDLA sets out the ground rules for the parties to negotiate possible SOWs and articulates agreed-upon procedures, practices, and terms applicable to SOWs the parties might execute in the future. As the trial court stated in its order, "the main purpose of the MDLA is to

provide 'the general terms and conditions under which' the parties would explore a further relationship . . . the MDLA does not require that a Statement of Work ever be executed."

Plaintiff argues that the MDLA contains numerous material terms that are not resolved, and thus does not represent an enforceable agreement. However, Plaintiff does not cite provisions or terms of the MDLA itself, but only terms of possible SOWs. Plaintiff fails to articulate how open terms in a hypothetical future SOW would make the terms of the MDLA itself unenforceable. We again quote from the trial court's order:

"Though the MDLA may not contain many of the substantive terms of the contemplated ultimate relationship of the parties itself— which appears to be the provision of technological deliverables—none of its own terms remain to be negotiated. . . .

[T]he majority of the MDLA's provisions pertain directly to Statements of Work, should any have been entered. Sony USA argues that this demonstrates that the MDLA's effect depends on a Statement of Work. However, such dormant provisions neither demonstrate a lack of assent to the MDLA's terms nor otherwise provide grounds upon which to negate those provisions of the MDLA that do not pertain directly to Statements of Work, such as the Forum Selection Clause[.]"

*Sony Ericcson*, No. COA 08-525, slip op. at 7–8 (N.C. Ct. App. March 3, 2009).

{38}  The Court of Appeals also noted that the parties were sophisticated businesses who could have provided that enforcement of the forum selection clause could only occur if a SOW was executed. Similarly, the sophisticated parties to this Master Agreement could have placed limitations on the impasse provisions but did not do so.

{39}  In summary, Defendants' Motion to Dismiss based upon unenforceability of the impasse provisions in the Master Agreement is **DENIED**.

V.

CONCLUSION

{40}    Based on the foregoing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendants' Motion to Dismiss the Amended Complaint is **DENIED**.


**SO ORDERED**, this 13th day of March, 2009.